10 - 11043-RBS

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA; and
THE STATES OF CALIFORNIA, DELAWARE,
FLORIDA, GEORGIA, HAWAII, ILLINOIS,
INDIANA, LOUISIANA, MICHIGAN,
MINNESOTA, MONTANA, NEVADA, NEW
HAMPSHIRE, NEW JERSEY, NEW MEXICO,
NEW YORK, NORTH CAROLINA, OKLAHOMA,
RHODE ISLAND, TENNESSEE, TEXAS,
WISCONSIN, THE COMMONWEALTHS OF
MASSACHUSETTS and VIRGINIA, and THE
DISTRICT OF COLUMBIA,

CIVIL ACTION NO.

FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)(2)
JURY TRIAL DEMANDED

ex rel. HELEN GE, M.D.

PLAINTIFFS AND RELATOR,

v.

TAKEDA PHARMACEUTICAL COMPANY
LIMITED; and
TAKEDA PHARMACEUTICALS NORTH
AMERICA, INC.

DEFENDANTS

FALSE CLAIMS ACT
COMPLAINT

## I.    OVERVIEW OF FACTUAL ALLEGATIONS

1.      Helen Ge, M.D. ("Relator"), through her attorneys, Baum, Hedlund, Aristei &

Goldman, P.C., and Roddy, Klein & Ryan, brings this action on behalf of the United States of

America ("United States") for treble damages and civil penalties arising from Defendants Takeda

Pharmaceutical Company Limited's and Takeda Pharmaceuticals North America, Inc's.

(collectively referred to as "Takeda" or "Defendants") conduct in violation of the Federal Civil

False Claims Act, 31 U.S.C. § 3729, *et seq.* ("FCA"). The violations arise out of false claims

for payment made to Medicare, Medicaid, Tricare and other federally funded government

healthcare programs (hereinafter, collectively the "Government Healthcare Programs").

2.     This action is also brought under the respective *qui tam* provisions of False
Claims Acts (or similarly named) on behalf of the States of California, Delaware, Florida,
Georgia, Hawaii, Illinois, Indiana, Louisiana, Massachusetts, Michigan, Minnesota, Montana,
Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma,
Rhode Island, Tennessee, Texas, the District of Columbia, Virginia, and Wisconsin. These
states, together with the United States, are hereafter collectively referred to as the Government.

3.     This is an action to recover damages and civil penalties on behalf of the
Government arising from false and fraudulent records, statements, and claims made, used and
caused to be made, used or presented by Defendants and/or their agents, employees and co-
conspirators in violation of the Federal Civil False Claims Act, 31 U.S.C. §3729 et. seq., as
amended ("the FCA" or "the Act").

4.     As set forth below, Defendants' acts also constitute violations of the California
False Claims Act, Cal. Govt Code §12650 *et seq*.; the Delaware False Claims and False
Reporting Act, 6 Del. C. §1201 *et seq*.; the Florida False Claims Act, Fla. Stat. §68.081 *et seq.*;
the Georgia False Medicaid Claims Act, Ga. Code Ann. §49-4-168 *et seq*.; the Hawaii False
Claims Act, Haw. Rev. Stat. §661-21 *et seq*.; the Illinois Whistleblower Reward and Protection
Act, 740 Ill. Comp. Stat. §17511-8; the Indiana False Claims and Whistleblower Protection Act,
Ind. Code Ann. §5-11-5.5-1 *et seq*.; the Louisiana Medical Assistance Programs Integrity Law,
La. Rev. Stat. §437.1 *et seq*.; the Massachusetts False Claims Law, Mass. Gen. Laws ch. 12 §5 *et
seq*.; the Michigan Medicaid False Claims Act, Mich. Comp. Laws §400.601 *et seq*.; the
Minnesota False Claims Act, Minn.Stat. §§ 15C.01 *et seq*.; the Montana False Claims Act, Mont.
Code Ann. §17-8-401 *et seq*.; the Nevada False Claims Act, Nev. Rev. Stat. Ann. §§357.010 *et
seq*.; the New Hampshire False Claims Act, N.H. Rev. Stat. Ann. §167.61 *et seq*; the New Jersey
False Claims Act, N.J. Stat. §2A:32C-l *et seq*.; the New Mexico Medicaid False Claims Act,

2

N.M. Stat. Ann. §27-2F-l *et seq.*; the New York False Claims Act, N.Y. State Fin. §187 *et seq.*; the North Carolina False Claims Act, N.C.G.S., §1-605 *et seq.*; the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63 §5053 *et seq.*; the Rhode Island False Claims Act, R.I. Gen. Laws §9-1.1 *et seq.*; the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§71-5-181 *et seq.*; the Texas Medicaid Fraud Prevention Law, Tex. Hum. Res. Code Ann. §§36.001 *et seq.*; the Virginia Fraud Against Taxpayers Act, Va. Code Ann. §§8.01-216.1 *et seq.*; the Wisconsin False Claims Act for Medical Assistance, Wis. Stat. §20.931 *et seq.*; and the District of Columbia Procurement Reform Amendment Act, D.C. Code Ann. §§1-1188.13 *et seq.*

5.    As alleged herein, Takeda has caused thousands, if not millions, of false claims to be made on federal and state health care programs.

6.    Takeda is the manufacturer of the prescription drug Actos, which is used to treat Type II Diabetes. Actos is Takeda's most profitable drug, with $3.1 billion annual sales in 2008 and $3.4 billion annual sales in 2009, according to an April 6, 2010 IMS Health report. In the last two years, Actos alone has been responsible for more than half of the total revenue of Takeda Pharmaceuticals North America. Takeda was able to capture a majority of the Diabetes drug market by falsely portraying Actos as safer than it actually was.

7.    Actos, however, is not as safe as Takeda has led the FDA, healthcare professionals and the general public to believe. Rather, the FDA and the public were led to believe that Actos is safer because Takeda failed to properly report all of the Actos related Congestive Heart Failure adverse events to the FDA. Notwithstanding the fact that the FDA has classified Congestive Heart Failure as a serious adverse event by placing a Black Box Congestive Heart Failure warning on Actos' package insert, Takeda instructed its medical reviewers not to report hundreds of non-hospitalized or non-fatal Congestive Heart Failure cases as "serious" adverse events and thus avoided its responsibility of accurately analyzing and

3

reporting these hundreds of serious adverse events to the FDA. Because Takeda failed to accurately report all of the Actos related Congestive Heart Failure adverse events, these events were not properly identified or reported in the FDA's safety database, the Adverse Event Reporting System ("AERS"), which for older drugs such as Actos only lists the "serious" adverse events.

8.      Relator estimates that Takeda failed to report several hundred Congestive Heart Failure adverse events as serious between late 2007 and January 2010. To illustrate the magnitude of this failure, between 1999 and 2009, the manufacturer of Avandia reported a cumulative total of 2,628 Congestive Heart Failure adverse events during that 10 year period.

9.      Upon information and belief, Takeda's motivation to fraudulently report and under report the serious adverse events was driven by an economic desire to falsely enhance Actos' safety profile and to increase sales. Vice President of Takeda's Pharmacovigilance Department, Dr. Maria Paris, informed her employees, including Relator, that "As a company, reporting adverse events is one thing, but we must make sure that the company has to be profitable first."

10.     As outlined herein, on multiple occasions Takeda improperly instructed its medical reviewers, including Relator, Helen Ge, M.D., to change their professional opinion concerning adverse event classifications and assessments. When Relator complained of the improper reporting, her contract was summarily terminated.

11.     Takeda's failure to properly and accurately report hundreds of serious Congestive Heart Failure adverse events caused the FDA to falsely view Actos as safer than it really was. In an October 7, 2008 report, Dr. David J. Graham, the Associate Director for Science and Medicine, Office of Surveillance and Epidemiology at the FDA commented that "there was strong evidence that rosiglitazone [Avandia] confers an increased risk of AMI and heart failure

compared to pioglitazone [Actos]." Further, in a May 2010 observational study Dr. Graham and colleagues conducted comparing Avandia to Actos, in the absence of accurate adverse event amounts for Actos CHF events due to Takeda's mis-categorizations, the authors projected excess "serious cardiovascular harm or death as a result of using Avandia instead of Actos." Had Takeda not submitted false reports or records to the FDA, the FDA and the public would not have been misled regarding the safety of Actos, which, at minimum, would have resulted in far fewer submissions of claims for Actos to Government Healthcare Programs.

12. On July 13 and 14, 2010, a joint meeting of the Endocrinologic and Metabolic Drugs and the Drug Safety and Risk Management advisory committees will meet to review results from the Rosiglitazone Evaluated for Cardiac Outcome and Regulation of Glycemia in Diabetes (RECORD) trial, as well as observational data, health-claims data, and a meta-analysis of controlled clinical trials. **The FDA also plans to present its meta-analysis of several trials of pioglitazone (Actos) to help panel members understand the relative risk and benefits of the two market-approved thiazolidinediones.**

13. But for Takeda's fraud, Government health care programs would have paid for substantially fewer Actos claims. But for the fraud, physicians would have prescribed Actos less frequently than they did, and patients would have used Actos less than they did. Upon information and belief, Takeda's fraud has caused tens of thousands of false claims to be made on federal and state health care programs causing the Government to have suffered hundreds of millions of dollars of damages.

## II.   FEDERAL JURISDICTION AND VENUE

14. The acts proscribed by 31 U.S.C. § 3729 *et seq*. and complained of herein occurred in the District of Massachusetts and elsewhere, as Defendants do business in the District of Massachusetts and throughout the United States. Therefore, this Court has

jurisdiction over this case pursuant to 31 U.S.C. § 3732 (a), as well as under 28 U.S.C. §§ 1331 and 1345. This Court has supplemental jurisdiction over this case for the claims brought on behalf of the states (referenced in paragraph 2) pursuant to 31 U.S.C. §3732(b) and/or 28 U.S.C. § 1367, inasmuch as recovery is sought on behalf of said states which arises from the same transactions and occurrences as the claims brought on behalf of the United States.

15.     This court has personal jurisdiction over defendants Takeda Pharmaceutical Company Limited and Takeda Pharmaceuticals North America, Inc. pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because defendants have minimum contacts with the United States. Moreover, the defendants can be found in, reside, or transact or have transacted business in this District.

16.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), and 28 U.S.C. §1391 because Defendants transact business in this District, and one or more of the acts proscribed by section 31 U.S.C. §3729 occurred in this District. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this District, maintained employees and offices in this District, and made significant sales within this District.

17.     The facts and circumstances alleged in this Complaint have not been publicly disclosed in a criminal, civil or administrative hearing, nor in any congressional, administrative, or government accounting office report, hearing, audit investigation, or in the news media.

18.     Relator is an "original source" of the information upon which this complaint is based, as that term is used in the False Claims Act.

## III.   PARTIES

19.     The United States funds the provision of medical care, including pharmaceutical products, for eligible citizens through Government Healthcare Programs such as Medicare, Medicaid, TRICARE and other agencies and programs, acting through the Centers for Medicare

6

& Medicaid Services ("CMS") within the U.S. Department of Health and Human Services ("HHS"), the Department of Defense, and other federal agencies.

20.     Relator Helen Ge, M.D. is a resident of North Reading, Massachusetts. Dr. Ge is a graduate of the First Medical University of Shanghai and conducted her residency and post-doctorate education at the Postgraduate Medical School of PLA in Beijing, China. During the 1980s and 1990s, she was a Clinical Research Fellow at the University of Pittsburgh School of Medicine and later became an Associate Medical Director at Harvard Clinical Research Institute, which is affiliated with Harvard Medical School.

21.     From 1998 through to the present, Dr. Ge has worked as an independent consultant and contractor for various major pharmaceutical companies in the United States. Her work has specialized in  assisting pharmaceutical companies with, among other things, preparing FDA mandated safety reports, reviewing and evaluating clinical trial data, performing medical review for spontaneous and clinical study adverse event reports and making side-effect causality assessments associated with a manufacturer's pharmaceutical products.

22.     In September 2008, Dr. Ge accepted an assignment to consult as a Contract Physician of Drug Safety with Takeda Pharmaceuticals North America. The consulting agreement had an initial term of one year with an end date of October 6, 2009.

23.     Dr. Ge was contracted to, among other things, perform medical review of spontaneous and clinical trial adverse events and serious adverse event reports; to confirm the seriousness of the adverse events; to make causality assessments; and to assist with risk management by identifying and evaluating potential safety signals and providing analysis of product safety. As part of her assignments, she was assigned to medically review all adverse events associated with the drug Actos.

7

24.     Because of her excellent performance at Takeda, Dr. Ge's initial consulting contract was extended another six months, with a new end date of March 31, 2010. She was continuously a contractor for Takeda Pharmaceuticals North America at its Lake Forest, Illinois facility from October 2008 until her contract was prematurely and wrongfully terminated on January 15, 2010.

25.     Takeda Pharmaceutical Company Limited ("TPC") is a Japanese corporation having its corporate headquarters and principal place of business in Osaka, Japan. TPC is the largest pharmaceutical company in Japan. According to its 2009 annual reports, TPC's annual sales exceeded $15 billion.

26.     Takeda Pharmaceuticals North America, Inc. ("TPNA") is a wholly owned U.S. subsidiary of TPC. TPNA is organized under the laws of Delaware and has its principal place of business in Deerfield, Illinois. TPNA is one of the 15 largest pharmaceutical companies in the United States. According to its annual report, TPNA's 2008 annual sales were reported to be in excess of $5 billion. More than half of its annual sales were attributable to its prescription drug Actos – whose 2008 annual sales exceeded $2.9 billion. In the following year (2009), Actos' annual sales were reported to be $4.2 billion.

27.     In 2008, TPNA merged with TAP Pharmaceutical Products, Inc. ("TAP"), which was another TPC subsidiary. TAP had a history of dealing dishonestly with the federal government. In 2001, TAP, as well as six of its corporate executives, pled guilty to various charges arising out of their "fraudulent drug pricing and marketing conduct" with regard to Lupron, a Takeda drug used to treat prostate cancer. To avoid prosecution, TAP pled guilty to conspiracy to violate the Prescription Drug Marketing Act and paid a $290,000,000 criminal fine (which at the time was the largest criminal fine ever in a health care fraud prosecution). In addition, as part of the plea agreement, TAP agreed to settle its federal civil False Claims Act

8

liabilities and to pay the U.S. Government $559,483,560 for filing false and fraudulent claims with the Medicare and Medicaid programs as a result of TAP's fraudulent drug pricing schemes and sales and marketing misconduct. TAP also agreed to comply with the terms of a sweeping Corporate Integrity Agreement, which, among other things, required it to deal honestly with the United States and the Medicare and Medicaid programs.

28.     Following the 2008 merger, many of TAP's employees, including some of the employees who had pled guilty to fraud, continued their employment at TPNA.

29.     TPC and TPNA will be collectively referred to as "Takeda" or "Defendants."

30.     Takeda is engaged in the business of research, developing, manufacturing and marketing of a broad spectrum of pharmaceutical products, including Actos (pioglitazone).

31.     Takeda is currently transacting business in the District of Massachusetts, at least by maintaining offices and employees in this District, marketing and shipping into this District, or by using, offering to sell, or selling or by causing others to use, offer to sell or sell, pharmaceutical products, including Actos in this District. Takeda derives substantial revenue from interstate and or international commerce, including substantial revenue from goods used or consumed or services rendered in the State of Massachusetts and this Judicial District.

## IV.    BACKGROUND

32.     Actos is Takeda's trade name for its multi-billion dollar blockbuster drug pioglitazone. Actos (pioglitazone) is a prescription drug within a class of drugs known as thiazolidinediones ("TZDs"), which are prescribed for the treatment of Type II diabetes. Today, the two primary TZDs marketed in the United States are Actos (manufactured by Takeda) and Avandia (rosiglitazone), which is manufactured and distributed by GlaxoSmithKline LLC ("GSK").

33.    Takeda submitted its New Drug Application ("NDA") to the U.S. Food and Drug Administration ("FDA") on January 15, 1999. Six months later, on July 15, 1999 the U.S. Food and Drug Administration approved Actos' New Drug Application ("NDA") (NDA No. 21-073). The FDA approved Actos for use to improve glycemic control in patients with Type II Diabetes (non-insulin-dependent diabetes mellitus).

## V.    THE FALSE CLAIMS ACT

34.    The False Claims Act (hereinafter referred to as "FCA" or "the Act"), 31 USC § 3729, was originally enacted in 1863, and was substantially amended in 1986 by the False Claims Amendments Act, Pub.L. 99-562, 100 Stat. 3153. Congress enacted the 1986 amendments to enhance and modernize the government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of Government fraud to disclose the information without fear of reprisal or government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf. The FCA was further amended in May 2009 by the Fraud Enforcement and Recovery Act of 2009 ("FERA") and again in March 2010 by the Patient Protection and Affordable Care Act ("PPACA"). Both FERA and PPACA made a number of procedural and substantive changes to the FCA in an attempt to ease the government and private Relators' burdens in investigating and prosecuting *qui tam* suits under the FCA.

35.    The FCA provides that any person who knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim is liable for a civil penalty ranging from $5,000 up to $10,000 (and

10

adjusted upward for inflation) for each such claim, plus three times the amount of the damages sustained by the federal government.

36. The FCA allows any person having information about false or fraudulent claims to bring an action for himself and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time). Based on these provisions, *qui tam* plaintiff/relator seeks through this action to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein.

## VI. FEDERAL HEALTH CARE PROGRAMS

37. In 1965, Congress enacted Title XVIII of the Social Security Act (known as "Medicare" or the "Medicare Program") to pay for the cost of certain medical services and care. Entitlement to Medicare is based on age, disability or affliction with certain diseases. See 42 U.S.C. §1395 to 1395ccc. Outpatient prescription drugs are covered under Parts A-D of the Medicare Program.

38. In 1965, the federal government also enacted the Medicaid program. It is a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS. 42 U.S.C. §§ 1396a(a)-(b). States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. 42 U.S.C. §§1396b(a)(1), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan." See 42 U.S.C. §1396b(a)(1). This federal-to-state payment is known as

11

Federal Financial Participation ("FFP"). Outpatient prescription drugs are covered under the Medicaid Program as long as they meet the definition of a "Covered Outpatient Drug."

39.     TRICARE Management Activity, formerly known as CHAMPUS, is a program of the Department of Defense that helps pay for covered civilian health care obtained by military beneficiaries, including retirees, their dependents, and dependents of active-duty personnel.  10 U.S.C. §§ 1079, 1086; 32 C.F.R. Part 199.  TRICARE contracts with fiscal intermediaries and managed care contractors to review and pay claims, including claims submitted for outpatient prescription drugs.

40.     Pharmaceutical drugs are also used on an inpatient basis, purchased by nursing homes, hospitals, and other facilities for inpatients.  Generally, in such settings, the provider does not separately bill the Government Healthcare Programs for the drug -- rather, the provider is reimbursed based upon a composite rate, a daily rate, the actual cost, or a combination.  Even so, federally funded Government Healthcare Programs such as Medicare Part A, Medicaid inpatient, and TRICARE inpatient benefit are damaged when they pay for pharmaceuticals that have been paid for in violation of the FCA.

41.     Under the Medicare Act, 42 U.S.C. § 1395y(a)(1)(A), there is an express fundamental condition of payment: "no payment may be made [under the Medicare statute] for any expenses incurred for items or services which . . . are not reasonable and necessary for the diagnosis or treatment of illness or injury." This condition links each Medicare payment to the requirement that the particular item or service be "reasonable and necessary." Medicaid, TRICARE and other federally funded programs restrict coverage under the same principle.

42.     Hospitals and other inpatient facilities participating in the Medicare, Medicaid and other federally funded Government Healthcare programs are required to file annual cost reports with the appropriate agencies.  When a provider submits a Medicaid cost report which

12

includes requests for payment for pharmaceuticals that were not reasonable and necessary, the claims for those expenses are legally false.

## VII.   THE FOOD, DRUG AND COSMETIC ACT AND ITS POST MARKETING SAFETY REPORTING REGULATIONS

43.     The Food and Drug Administration ("FDA") is the agency responsible for protecting the health and safety of the American public by ensuring, among other things, that pharmaceuticals designed for use in humans are safe and effective for their intended uses and are labeled accurately and in compliance with the law. Toward this end, FDA, pursuant to its statutory mandate, regulates and monitors the approval, manufacture, processing, packing, labeling, and shipment in interstate commerce of pharmaceuticals.

44.     To ensure that consumers are receiving safe and effective drugs, Congress through various amendments enacted the Food, Drug, and Cosmetic Act, which requires that a drug manufacturer secure approval of a New Drug Application from the FDA before it may commercially market the drug. 21 U.S.C. §355(a). To obtain such approval, the manufacturer must undertake to conduct and submit the results of investigations in animals and humans that demonstrate that the drug is safe and effective for its intended uses and other information pertinent to an evaluation of the safety and effectiveness of the drug. 21 U.S.C. §355; see also 21 C.F.R. §314.50 (detailing contents of NDA). According to the statutory scheme, the FDA evaluates the safety and effectiveness of the drug and approves the directions for use and cautionary information in the labeling for the drug on the basis of the information supplied to it by the manufacturer. The FDA does not conduct its own tests of the drug. It relies on the manufacturer to inform it of adverse reaction reports. Thus, the FDA's ability to!evaluate a drug's safety and efficacy and to protect the public adequately depends on the manufacturer's reports of timely, accurate and complete data to the FDA.

13

45.     After the drug has been approved for commercial marketing, the FDCA and applicable regulations require the manufacturer to establish and maintain such records and make such reports as will enable the FDA to continue to evaluate the safety and effectiveness of the drug and, when appropriate, withdraw the New Drug Application or change the labeling. 21 U.S.C. §355(k).

46.     To implement Congress' mandate, the FDA promulgated 21 C.F.R. §314.80 and 314.81, which require expedited and accurate reports of postmarketing adverse drug experiences ("ADE") by drug manufacturers. The manufacturer must report information pertinent to the safety and effectiveness of the drug, from any source, including unpublished reports of clinical experience not previously submitted to the FDA. The regulations require the manufacturer to report within 15 days any unexpected side effects and injuries associated with the drug. The manufacturer must report all other adverse reactions to the FDA in quarterly periodic reports during the first three years following approval, and then thereafter at annual intervals. 21 C.F.R. §314.80(c)(2).

47.     These FDA regulations provide that drug manufacturers "shall promptly review all adverse drug experience information obtained or otherwise received by the applicant from any source, foreign or domestic, including information derived from commercial marketing experience, postmarketing clinical investigation, postmarketing epidemiological/surveillance studies, reports in the scientific literature and unpublished scientific papers." 21 C.F.R. §314.80(b). The regulations go on to provide that "any person subject to the reporting requirements . . . shall also develop written procedures for the surveillance, receipt, evaluation, and reporting of postmarketing adverse drug experiences to FDA." 21 C.F.R. §314.80(b).

48.     An "adverse experience" is defined as "any undesirable event that is associated with the use of a drug or biological product in humans whether or not considered product-related

14

by the [manufacturer]." The FDA in its regulations (21 C.F.R. §314.80(b)) and in its Guidance Documents has classified four types of adverse experiences which trigger different reporting requirements. The four categories include:

- **Serious and Unexpected**: these include serious adverse experiences which are not provided for in the label. Serious adverse events include death, life threatening adverse experiences, hospitalization, significant persistent disability/incapacity, and important medical events based upon appropriate medical judgment that may jeopardize the patient and may require medical or surgical intervention. Such events must be reported to the FDA within 15 days of initial receipt of the adverse event. 21 C.F.R. §314.80(b)(1).

- **Serious and Expected**: these include serious adverse experiences that are listed in the current label. For example, if the warning section of the label warns that the drug can cause suicide and a patient commits suicide, this would be classified as a serious and expected adverse experience which must be reported to the FDA in the manufacturer's quarterly and/or annual safety reports.

- **Non-serious and Unexpected**: these include non-serious adverse experiences that are not provided for in the label. For example, if a patient suffers from dry-mouth as a result of taking a drug, and the label of the drug does not warn about the risk of dry-mouth, then this would constitute a non-serious and unexpected adverse experience which must be reported to the FDA in the manufacturer's quarterly and/or annual safety reports.

- **Non-serious and Expected**: these include non-serious adverse experiences that are already in the label. For example, if a patient develops dry-mouth after taking the drug and the label of the drug warns of the risk of dry mouth, then this would

constitute a non-serious and expected adverse event. While non-serious and

expected adverse events are to be reported to the FDA in the manufacturer's

quarterly and/or annual safety reports, they are *not* listed out in detail in the

periodic reports and, in fact, the FDA encourages manufacturers to obtain waivers

from having to submit the individual case safety reports for non-serious expected

adverse experiences.

49.     A manufacturer's failure to comply with the FDCA reporting obligation

constitutes a "prohibited act" under the FDCA which subjects the manufacturer to various civil

and criminal penalties, including but not limited to withdrawal of the approval of the NDA (i.e.,

prohibiting the continued marketing of the drug), injunctive orders, monetary fines and up to one

year imprisonment. *See* 21 U.S.C § 331(e); 21 U.S.C § 332(a); 21 U.S.C § 333(a)(1); 21 U.S.C.

§355(e); and 21 C.F.R.§314.80(j).

## VIII.  SUBSTANTIVE ALLEGATIONS

50.     There are serious health risks associated with prescription drugs whose sponsors

fail to abide by the FDA's ADE reporting requirements. This risk becomes even more poignant

when taking into account the fact that approximately eighty percent of drug spending in

Government Healthcare Programs is for elderly and disabled enrollees, who have extensive

health care needs.

51.     In addition, any patient who has taken an unsafe and/or ineffective drug is likely

to require additional laboratory tests and physician visits, thereby causing additional unnecessary

increased costs to Government Healthcare Programs.

52.     In order to dominate the diabetes drug market, to increase the sales of Actos and

to facilitate the continued reimbursement from Government Healthcare Programs for claims

made by providers for Actos, Takeda misrepresented and/or concealed material facts regarding adverse events attributable to Actos.

53.     Takeda disregarded its duty to deal honestly with the Government and with knowledge that its concealment and intentional misrepresentations would result in hundreds of millions, and perhaps billions of dollars in damage to Government Healthcare Programs.

54.     On May 21, 2007, the *New England Journal of Medicine* published an online study which found a 43% increase in risk of acute myocardial infarction (AMI) and a 64% increase in risk of cardiovascular death with patients who had been prescribed Avandia (a diabetes drug manufactured by GSK that is in the same class as Actos). See Steven E. Nissen, *Effects of Rosiglitazone on the Risk of Myocardial Infarction and Death from Cardiovascular Causes*, 356 N. ENG. J. MED. 2457-71 (2007) ("Nissen Study").

55.     On May 23, 2007, following publication of the Nissen Study, the FDA ordered all TZD manufacturers, including GSK (for Avandia related products) and Takeda (for Actos related products) to add a stronger warning about the risk of Congestive Heart Failure, a condition that occurs when the heart does not adequately pump blood. The new warnings were included in the form of a "boxed" warning — FDA's strongest form of a warning. 21 C.F.R. §201.57(c)(1). The upgraded warning emphasized that the drugs may cause or worsen heart failure in certain patients. Specifically, the 2007 Boxed Warning Provides:

### WARNING: CONGESTIVE HEART FAILURE

- Thiazolidinediones, including ACTOS, cause or exacerbate congestive heart failure in some patients (see WARNINGS). After initiation of ACTOS, and after dose increases, observe patients carefully for signs and symptoms of heart failure (including excessive, rapid weight gain, dyspnea, and/or edema). If these signs and symptoms develop, the heart failure should be managed according to the current standards of care. Furthermore, discontinuation or dose reduction of ACTOS must be considered.

17

- ACTOS is not recommended in patients with symptomatic heart failure. Initiation of ACTOS in patients with established NYHA Class III or IV heart failure is contraindicated (see CONTRAINDICATIONS and WARNINGS).

56.    In an August 2007 Press Release regarding the Black Box Warning, the FDA stated that it had asked the drugs' manufacturers, GlaxoSmithKline and Takeda, to address the safety concerns related to heart failure. In the same press release, FDA directors also noted that "Under FDA's postmarketing surveillance program, we carefully monitor new safety information for marketed drugs and take appropriate action when necessary to inform patients and health care providers of new information."

57.    Because the majority of the risk data, including the Nissen Study, focused on Avandia, the FDA began to work with GSK, the manufacturer of Avandia, to conduct further studies to examine cardiovascular risks.

58.    The cardiovascular safety concerns raised about Avandia, including the implementation of the class wide Congestive Heart Failure Boxed warning, prompted Takeda to position its drug, Actos, as the safer alternative to Avandia and try to capture a larger share of the diabetes drug market. Notably, after the implementation of the FDA's 2007 class wide Congestive Heart Failure black-box warning as well as the negative publicity surrounding Avandia, Takeda implemented a nationwide advertising campaign to promote the purported safety of Actos. In November 2007, Takeda began to run print advertising in 82 major market newspapers and national publications such as Time and Newsweek, advising readers with type 2 diabetes that "Actos has been shown to lower blood sugar without increasing your risk of having a heart attack or stroke."

59.    Upon information and belief, Takeda stated that it wanted to inform patients afraid of treatment due to the cloud over Avandia, that not all oral diabetes drugs are alike when it comes to heart risks. Shay Weisbrich, a general manager at Takeda, publicly stated: "A lot of

patients on oral anti-diabetes drugs seemingly left the market over the last six months...The confusion goes way beyond TZDs to all classes of drugs. This is a very unusual step for us, but we felt compelled to reach out to patients directly with a message of clarity and get them to talk to their physicians." In addition, Takeda also supplied physicians with sales aids in an attempt to advertise Actos as being safe and free of any cardiovascular risks.

60. To make Actos appear as the safer alternative, Takeda instigated a policy where it instructed its employees to classify most Congestive Heart Failure adverse events as non-serious. Takeda knew reporting non-hospitalized Congestive Heart Failure events as serious would trigger more prominent reporting requirements and would have caused the events to be listed in the FDA's safety database (AERS). Instead, Takeda instructed its employees to *only* report Congestive Heart Failure cases involving *hospitalization or fatality* as a serious adverse event.

61. Notably, prior to the implementation of the Boxed Warning, Takeda was reporting all Congestive Heart Failure events (including hospitalized and non-hospitalized cases) as serious events. However, following the implementation of the Boxed Warning and realizing the negative publicity surrounding the cardiovascular risks associated with Avandia, Takeda made a decision to report only hospitalized or fatal Congestive Heart Failure events as serious events, thus substantially reducing the number of serious Congestive Heart Failure events reported for Actos. Furthermore, by not reporting all Congestive Heart Failure cases as serious events, Actos avoided the additional responsibility of highlighting these adverse events in its FDA reports and further avoided the responsibility of having to analyze the frequency and reporting rate of these adverse events. Moreover, because the FDA's public safety database (AERS) only captures "serious" adverse events, these non-reported serious Congestive Heart Failure events were never entered into the FDA's public safety database. Simply put, by fraudulently classifying the Congestive Heart Failure cases as non-serious, Takeda was able to

19

reduce and eliminate its reporting and analysis obligation and was able to publicly make Actos appear much safer than it really was. Unlike Takeda, GSK, the manufacturer of Avandia, has been reporting non-hospitalized cases of Congestive Heart Failure as "serious" adverse events.

62.     Congestive Heart Failure is listed as a Boxed Warning in the Actos label. Pursuant to FDA Regulations, a Boxed Warning is reserved for the most serious of adverse events. Specifically, the regulations provide that "[c]ertain contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box." By requiring a boxed warning for Congestive Heart Failure, the FDA had made a determination that all Congestive Heart Failure cases are "serious" adverse events and Takeda had a corresponding duty to report all Congestive Heart Failure events as serious events.

63.     In addition, the U.S. National Library of Medicine and the National Institutes of Health define Congestive Heart Failure as serious:

> Heart failure, also called congestive heart failure, is a condition in which the heart can no longer pump enough blood to the rest of the body...Heart failure is a *serious* disorder. It is usually a chronic illness, which may get worse with infection or other physical stress.
> (http://www.nlm.nih.gov/medlineplus/ency/article/000158.htm)
> (emphasis added)

64.     Moreover, respected national and international medical organizations, including the Council for International Organizations of Medical Sciences (CIOMS), which publishes pharmacovigilance guidelines to which numerous pharmaceutical companies adhere, has concluded that Congestive Heart Failure should "always be considered 'serious'" and should be reported as a serious adverse event in periodic reports. *See* 2001 Report of CIOMS Working Group V at 191-194.

65.    Many other consumer sources on which doctors rely define Congestive Heart

Failure as either "serious" or "severe":

> Drugs.com:  Seek medical attention right away if any of these
> SEVERE side effects occur when using Actos:  ...symptoms of
> *[congestive] heart failure* (eg, shortness of breath; sudden
> unexplained weight gain;
> (http://www.drugs.com/sfx/actos-side-effects.html)
>
> WebMD.com: [Congestive] Heart Failure listed as "Severe" side
> effect.
> (http://www.webmd.com/drugs/drug-17410-
> actos.aspx?drugid=17410&drugname=actos&source=1&pagenum
> ber=6)

66.    In addition, Takeda North America has consistently defined Congestive Heart

Failure, in public forums, as a serious event:

> Takeda Pharmaceuticals North America, Inc. (TPNA) today
> announced that the company will revise warnings related to
> congestive heart failure (CHF) in the prescribing label of its type 2
> diabetes medication ACTOS(R) (pioglitazone HCl).  Takeda is
> working in conjunction with a request from the U.S. Food and
> Drug Administration (FDA) that a Boxed Warning be added to the
> label.  The new Boxed Warning will heighten awareness of the risk
> of CHF.
>
> "By giving the CHF guidance more prominence in the ACTOS
> label, we hope to ensure that this information is being attended to
> by treating physicians to optimize patient care," said Robert
> Spanheimer, M.D., senior medical director, Diabetes and
> Metabolism, Takeda Pharmaceuticals North America.  "Takeda
> remains confident in the safety and efficacy of ACTOS when used
> according to its label, and with this revision, we can heighten
> patient and physician awareness of an already known, but *serious*
> side effect."  (June 2007) (emphasis added).
> (http://www.medicalnewstoday.com/articles/73375.php)

Takeda's failure to accurately report its Congestive Heart Failure adverse events as serious

adverse events was a violation of its obligations under the FDCA and FDA regulations. 21

C.F.R. §314.80 and 21 U.S.C. §355(k).

67.    Relator Dr. Ge was assigned the task of reviewing post-marketing adverse event

reports for Actos.  During her review of adverse events, she classified Congestive Heart Failure

cases as "serious" adverse events. Her Takeda colleagues and manager at Takeda, including Mike Zabrinas, R.N., Miche Hisada, M.D., Maria Paris, M.D. and Michelle Peralta, R.N., however, instructed her to alter her classification because, according to them, Takeda had a blanket policy of not classifying non-hospitalized Congestive Heart Failure cases as serious.

68.     Such a blanket policy of not counting non-hospitalization cases as "serious" events violates a manufacturer's pharmacovigilance obligations and further violates FDA regulations, which specifically provide that: "[i]mportant medical events that may not result in death, be life-threatening, or require hospitalization may be considered a serious adverse drug experience when, based upon appropriate medical judgment, they may jeopardize the patient or subject and may require medical or surgical intervention to prevent one of the outcomes listed in the definition." 21 C.F.R. §314.80(a) (definition of serious adverse drug experience).

69.     During the first week of January 2009, Relator triaged a Congestive Heart Failure case reported from Actos as serious and labeled. A few hours later, Mike Zabinas, a specialist, came to her office and stated that Takeda had an internal policy to assess Congestive Heart Failure as a non-serious and labeled event. Relator replied, in effect "Are you kidding me? Congestive Heart Failure is in the black boxed warning section, how could Takeda assess this event as non-serious?" Mr. Zabinas thereafter said that he knew that Relator was correct but it was Takeda's policy to assess Congestive Heart Failure as non-serious.

70.     A couple of hours later, Michie Hisada, MD, a Medical Director at Takeda, went to Relator's office and stated that Relator's assessment for the Congestive Heart Failure adverse event report was changed from serious to non-serious because Takeda's internal policy is to label Congestive Heart Failure events as non-serious unless the patient is hospitalized.

71.     Upon learning of Takeda's blanket policy to report all Congestive Heart Failure adverse events as non-serious unless hospitalized, Relator, on January 9, 2009, sent an email to