UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

——————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA et al. ex rel. HELEN GE, M.D. | ) ) ) | |
| Plaintiffs and Relator, | ) ) | Civil Action No. 10-11043-FDS |
| v. | ) ) | |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED and TAKEDA PHARMACEUTICALS U.S.A., INC., f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA, INC. | ) ) ) ) ) ) | **LEAVE TO FILE 40 PAGES GRANTED 5/11/12** |
| Defendants. | ) | |

——————————————————————

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA et al. ex rel. HELEN GE, M.D. | ) ) ) | |
| Plaintiffs and Relator, | ) ) | Civil Action No. 11-10343-FDS |
| v. | ) ) | |
| TAKEDA PHARMACEUTICAL COMPANY LIMITED and TAKEDA PHARMACEUTICALS U.S.A., INC., f/k/a TAKEDA PHARMACEUTICALS NORTH AMERICA, INC. | ) ) ) ) ) ) | **LEAVE TO FILE 40 PAGES GRANTED 5/11/12** |
| Defendants. | ) | |

——————————————————————

**CONSOLIDATED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS
TAKEDA PHARMACEUTICAL COMPANY LIMITED AND TAKEDA
PHARMACEUTICALS U.S.A. INC.'S JOINT MOTION TO DISMISS
RELATOR'S SECOND AMENDED QUI TAM COMPLAINTS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 3

I. THE COMPREHENSIVE FEDERAL STATUTORY AND REGULATORY FRAMEWORK GOVERNING PRESCRIPTION DRUG PRODUCTS ......................... 3

    A. FDA Regulation of Prescription Drug Products .................................... 3

    B. FDA Enforcement of the FDCA and Food and Drug Regulations ....................... 6

II. THE SUBJECT DRUGS ................................................................................ 6

III. MEDICARE, MEDICAID AND TRICARE .................................................. 8

IV. THE FALSE CLAIMS ACT ......................................................................... 9

V. RELATOR'S ALLEGATIONS .................................................................... 10

ARGUMENT ...................................................................................................... 12

I. RELATOR'S COMPLAINTS MUST BE DISMISSED FOR FAILURE TO STATE AN FCA CLAIM PURSUANT TO RULE 12(b)(6) ........................ 13

    A. Relator Has Not and Cannot Allege The Existence of Any False or Fraudulent Claims .................................................................................. 14

        1. Relator has not and cannot plead a misrepresentation of compliance with a precondition of payment in connection with submission of a claim so as to render any claim false or fraudulent ....... 15

        2. Relator's counterfactual theory of potential FDA withdrawal of approval cannot overcome her inability to plead a false claim ............... 17

        3. Relator's counterfactual theory is also inconsistent with federal statutes and regulations governing withdrawal of approved drugs .......... 21

    B. Relator Has Not Pled and Cannot Plead That Any Allegedly False Statement Was Material to the Submission of a False or Fraudulent Claim ....... 23

II. RELATOR'S COMPLAINTS MUST BE DISMISSED FOR FAILURE TO MEET FED. R. CIV. P. 9(B)'s HEIGHTENED PLEADING REQUIREMENTS ......... 26

    A. Relator Fails to Allege The Existence of Any False Claims With Particularity ......................................................................................... 26

    B. Relator Does Not Plead Materiality with Sufficient Particularity ...................... 31

III. RELATOR'S STATE LAW CLAIMS MUST BE DISMISSED .................................. 32

    A. Relator's State Law Claims Are Preempted By Federal Law ............................. 32

    B. Relator's State FCA Claims Fail Under Fed. R. Civ. P. 9(b) .............................. 34

## TABLE OF CONTENTS
(continued)

**Page**

    C.     Dismissal of Relator's Parallel FCA Claims Requires Dismissal of All State Law Claims .................................................................................................. 35

CONCLUSION ........................................................................................................................ 36

## TABLE OF AUTHORITIES

**Page**

CASES

*Anderson v. Wiggins*,
   460 F. Supp. 2d 1 (D.D.C. 2006) ............................................................................6

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937 (2009) ...............................................................13, 14

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ....................................................................................13, 14, 19

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ...........................................................................6, 32, 33, 34

*Cutler v. Hayes*,
   818 F.2d 879 (D.C. Cir. 1987) .............................................................................21

*In re Trasylol Prods. Liab. Litig.*,
   763 F. Supp. 2d 1312 (S.D. Fla. 2010) ............................................................ 18-19

*Lofton v. McNeil Consumer & Specialty Pharms.*,
   672 F.3d 372 (5th Cir. 2012) ...........................................................................33, 34

*Marrero-Gutierrez v. Molina*,
   491 F.3d 1 (1st Cir. 2007) .....................................................................................35

*Martinez v. Colon*,
   54 F.3d 980 (1st Cir. 1995) ...................................................................................35

*Massachusetts v. Schering-Plough Corp.*,
   No. 03-11865-PBS, 2011 WL 4436969 (D. Mass. Sept. 23, 2011).................... 14-15

*McClain v. Metabolife Int'l, Inc.*,
   401 F.3d 1233 (11th Cir. 2005) ..............................................................................4

*Mikes v. Straus*,
   274 F.3d 687 (2d Cir. 2001)...................................................................................18

*New York v. Amgen Inc.*,
   652 F.3d 103 (1st Cir. 2011) ........................................................................ passim

*Norris v. Baxter Healthcare Corp.*,
   397 F.3d 878 (10th Cir. 2005) ............................................................................ 4-5

*Pharm. Research and Mfrs. Of Am. v. Walsh*,
   538 U.S. 644 (2003)............................................................................24

*Ruiz Rivera v. Pfizer Pharms., LLC*,
   521 F.3d 76 (1st Cir. 2008)................................................................14

*Schering-Plough Healthcare Prods., Inc. v. Schwartz Pharma., Inc.*,
   547 F. Supp. 2d 939 (E.D. Wis. 2008), *aff'd*, 586 F.3d 500 (7th Cir. 2009) ..........................23

*Sec. & Exch. Comm'n v. Tambone*,
   597 F.3d 436 (1st Cir. 2010)................................................................19

*Stagikas v. Saxon Mortgage Servs., Inc.*,
   795 F. Supp. 2d 129 (D. Mass. 2011) ......................................... 13-14

*Stengel v. Medtronic Inc.*,
   __ F.3d __, 2012 WL 1255040 (9th Cir. Apr. 16, 2012)....................33, 34

*U.S. ex rel. Carpenter v. Abbott Labs, Inc.*,
   723 F. Supp. 2d 395, 402 (D. Mass. 2010) ...........................................10

*U.S. ex rel. Clausen v. Lab. Corp. of America, Inc.*,
   290 F.3d 1301 (11th Cir 2002) ......................................................14, 18

*U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*,
   543 F.3d 1211, 1222 (10th Cir. 2008) ..................................................22

*U.S. ex rel. Crennen v. Dell Mktg. L.P.*,
   711 F. Supp. 2d 157 (D. Mass. 2010) ..............................................27, 31

*U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*,
   579 F.3d 13 (1st Cir. 2009)..................................................................27

*U.S. ex rel. Gagne v. City of Worcester*,
   565 F.3d 40 (1st Cir. 2009)..................................................20, 26, 32

*U.S. ex rel. Glynn v. Compass Med., P.C.*,
   No. 09-12124-RGS, 2011 WL 5508916 (D. Mass. Nov. 10, 2011) .......................................26

*U.S. ex rel. Hopper v. Anton*,
   91 F.3d 1261 (9th Cir. 1996) ..............................................................22

*U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*,
   647 F.3d 377 (1st Cir. 2011)......................................................... passim

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
   360 F.3d 220 (1st Cir. 2004)......................................................... passim

*U.S. ex rel. Lamers v. City of Green Bay*,
   168 F.3d 1013 (7th Cir. 1999) ...............................................................................22

*U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*,
   525 F. Supp. 2d 972 (W.D. Tenn. 2007).............................................................25

*U.S. ex rel. Loughren v. Unum Provident Corp.*,
   No. 03-11699-PBS, 2005 WL 6471014 (D. Mass. Oct. 6, 2005)..........................29

*U.S. ex rel. Loughren v. Unum Group*,
   613 F.3d 300 (1st Cir. 2010)...........................................................................23, 24

*U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*,
   No. 09-1086, 2011 WL 2182422 (E.D. Va. May 4, 2011) .....................................15

*U.S. ex rel. Nowak v. Medtronic, Inc.*,
   806 F. Supp. 2d 310 (D. Mass. 2011) ........................................................... passim

*U.S. ex rel. Polansky v. Pfizer, Inc.*,
   No. 04-cv-0704 (ERK), 2009 WL 1456582 (E.D.N.Y., May 22, 2009) ................17

*U.S. ex rel. Poteet v. Bahler Med., Inc.*,
   619 F.3d 104 (1st Cir. 2010).................................................................................23

*U.S. ex rel. Provuncher v. Angioscore, Inc.*,
   No. 09-12176-RGS, 2012 WL 1514844 (D. Mass. May 1, 2012).............27, 29, 30

*U.S. ex rel. Roop v. Hypoguard USA, Inc.*,
   559 F.3d 818 (8th Cir. 2009) .......................................................17, 30, 31, 32

*U.S. ex rel. Rost v. Pfizer, Inc.*,
   507 F.3d 720 (1st Cir. 2007).......................................................................... passim

*U.S. ex rel. Tessitore v. Infomedics, Inc., et al.*,
   __ F. Supp. 2d __, 2012 WL 826889 (D. Mass. Mar. 12, 2012) ..................... passim

*U.S. ex rel. Totten v. Bombardier Corp.*,
   380 F.3d 488, 498, 501 (D.C. Cir. 2004)..............................................................27

*U.S. ex rel. Wall v. Vista Hospice Care, Inc.*,
   778 F. Supp. 2d 709 (N.D. Tex. 2011) .............................................................29, 35

*U.S. ex rel. Wilkins v. United Health Group, Inc.*,
   No. 08-3425, 2010 WL 1931134 (D.N.J. May 13, 2010).................................35-36

*U.S. ex rel. Wilkins v. United Health Group, Inc.*,
   659 F.3d 295 (3d Cir. 2011)......................................................................16, 17, 22

*United Mine Workers of Am. v. Gibbs,*
  383 U.S. 715 (1966)................................................................................35

*United States v. Data Translation, Inc.,*
  984 F.2d 1256, 1267 (1st Cir. 1992)........................................................23

*United States v. Rivera,*
  55 F.3d 703, 709 (1st Cir. 1995)..............................................................14

*Weinberger v. Hynson, Westcott & Dunning, Inc.,*
  412 U.S. 609 (1973)........................................................................3, 4, 21

STATUTES AND REGULATIONS

10 U.S.C. § 1074g.....................................................................................25

10 U.S.C. §1079.........................................................................................9

10 U.S.C. § 1086.........................................................................................9

18 U.S.C. § 1001.........................................................................................6

21 U.S.C. §§ 301 *et seq.*................................................................... passim

31 U.S.C. §§ 3729 *et seq.*................................................................. passim

42 U.S.C. §§ 1395w-101 *et seq.* .........................................................8, 24

42 U.S.C. §§ 1395w-4 *et seq.* .................................................................8

42 U.S.C. §§ 1396 *et seq.*.....................................................................9, 24

21 C.F.R. §§ 1.1 *et seq.*............................................................................3

21 C.F.R. § 10.30..................................................................................6, 23

21 C.F.R. §§ 314.80 *et seq.*............................................................... passim

32 C.F.R. § 199 *et seq.*.........................................................................9, 25

42 C.F.R. 423.100......................................................................................25

56 Fed. Reg. 46,191, 46,199-200 (Sept. 10, 1991) .....................................6

71 Fed. Reg. 3922, 3934 (Jan. 24, 2006) ....................................................4

Pub. L. No. 111-21, § 4, 123 Stat. 1617 (2009)......................................9, 10

OTHER AUTHORITIES

FDA, NDA 22-287 Approval (Jan. 30, 2009),
  http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/022287s000ltr.pdf. ...............8

FDA, NDA Approval (May 10, 1995),
  http://www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/020406_s000_part1.pdf...............8

FDA, NDA Approval Letter (Jul. 15, 1999),
  http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021073A_Actos...............................7

FDA, NDA Approval (Feb. 13, 2009),
  http://www.accessdata.fda.gov/drugsatfda_docs/nda/2009/021856s000 ................................7

FDA, Supplement Approvals (Aug. 4, 2011),
  http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/021073Orig1s043s04
  4-021842Orig1s014s015-022024Orig1s008s007-021925Orig1s010s011ltr.pdf. ...............7, 20

FDA, Supplemental Approval:  Fulfillment of Postmarketing Requirement (Jan 28,
  2011),
  http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/021856s003ltr.pdf ...............7

NBCI, AHFS Consumer Medication Information:  Dexlansoprazole (Feb. 15, 2012),
  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000496/. ....................................................8

NBCI, AHFS Consumer Medication Information: Febuxostat (June 1, 2009),
  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000499/. ....................................................7

NBCI, AHFS Consumer Medication Information: Lansoprazole (Feb. 12, 2012),
  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000964/. ....................................................8

NCBI, AHFS Consumer Medication Information: Pioglitazone (Oct. 15, 2011),
  http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001047/. ....................................................7

FDA, *The Sentinel Initiative:  National Strategy for Monitoring Medical Product Safety*
  (May 22, 2008),
  http://www.fda.gov/downloads/Safety/FDAsSentinelInitiative/UCM124701.pdf...................5

FDA's "Mini-Sentinel" safety pilot program is up and running, demonstrating rapid
  analysis of medical products safety questions (2011),
  http://www.fda.gov/downloads/Safety/FDAsSentinelInitiative/UCM268035.pdf...................5

Fed. R. Civ. P. 9(b) .............................................................................................................. passim

Fed. R. Civ. P. 12(b)(6)......................................................................................................... passim

S. Rep. No. 109-324..........................................................................................................................4

## **INTRODUCTION**

Relator, Helen Ge ("Relator"), seeks this Court's unprecedented expansion of the Federal False Claims Act ("False Claims Act" or "FCA") and various state false claims acts to cover claims of alleged lack of compliance with FDA adverse reporting requirements.  The crux of her two complaints against defendants Takeda Pharmaceutical Company Limited ("TPCL") and Takeda Pharmaceuticals U.S.A., Inc. f/k/a Takeda Pharmaceuticals North America, Inc. ("TPUSA" and collectively with TPCL, referred to throughout the Complaints as "Takeda") is her claim that Defendants' method and promptness of reporting adverse drug events to the Food and Drug Administration ("FDA") regarding four FDA approved drugs, Actos®, Dexilant®, Prevacid® and Uloric® (collectively the "subject drugs") was insufficient and resulted in more reimbursement claims for the drugs than otherwise would have been made.

The courts of this District (and its sister federal courts) have consistently rejected similar invitations to expand the False Claims Act to such lengths.  Indeed, just two months ago, in *U.S. ex rel. Tessitore v. Infomedics, Inc., et al.*, __ F. Supp. 2d __, 2012 WL 826889 (D. Mass. Mar. 12, 2012), the Court dismissed with prejudice a separate FCA complaint filed by many of the same attorneys who represent Relator here, advancing the very theory that Relator advances here. *See id.* (dismissing relator's complaint alleging pharmaceutical manufacturer violated FCA by allegedly failing to comply with the adverse event reporting requirements of 21 C.F.R. §314.80, allegedly rendering all claims for payment for such drugs false).

Relator's intended expansion of the FCA boundaries aside, her claims fail to establish the necessary elements to state an FCA claim.  A threshold defect in Relator's FCA claims is the glaring absence from the 229 pages and 832 paragraphs of Relator's Complaints of allegations that any false claims were submitted to any government agency, by anyone, at anytime.  Indeed, at all times, through today, the subject drugs were all approved for use by the FDA, and the

claims submitted for reimbursement to federal and state governments were both entirely proper and mandated under governing law.

Unlike other FCA complaints alleging improper government reimbursement of pharmaceutical products, Relator does not and cannot allege that the subject drugs were:  (i) not FDA-approved; (ii) subject to adverse FDA action; or (iii) otherwise ineligible for payment at the time claims were allegedly submitted to government payors.  Nor can she allege that any health provider submitted a claim seeking payment for a subject drug (i) without actually providing the drug to a patient, (ii) seeking payment of sums other than that allowed under a government healthcare program, or (iii) seeking reimbursement for a non-indicated ("off-label") or unnecessary use of the drug.

Instead, Relator alleges that, although Defendants reported certain post-marketing adverse events to FDA, she believes that they failed to properly report those events pursuant to the "alert reports" procedures of 21 C.F.R. § 314.80(c)(1).  The Complaints, therefore, do not even allege that Defendants failed to report adverse events to FDA altogether (as other recently dismissed FCA complaints have attempted), but only that Relator disagrees with Defendants' method of reporting of the events pursuant to the regulations' "periodic adverse drug experience reports" provisions, *id.* § 314.80(c)(2).  Relator, however, offers no allegations that any governmental body (FDA or otherwise) has made a finding that Defendants violated any post-marketing reporting requirements.

Armed with nothing more than an alleged comparison between how Defendants reported adverse events and her opinion as to how they "should" have reported them, Relator is left to build her entire FCA case on multiple layers of speculation.  First, Relator speculates that had Defendants reported the alleged adverse events in the manner she suggests, FDA might have

taken some action, including the possibility that FDA might have withdrawn all, or part, of its

approval of these products or required amendment of certain of the subject drugs' labels.  Relator

then leaps to the conclusion that, based on her speculation as to what FDA might have done, all

or substantially all of the claims for reimbursement for these products that were allegedly paid by

federal and state governments were somehow "false."

Relator's creation of a hypothetical, conjecture-based world simply does not meet the

elements of a False Claims Act violation.  This is so, notwithstanding that Relator's overwrought

false claims theory would (1) effectively transform every alleged lack of compliance with an

FDA regulation into a potential False Claims Act action and (2) allow relators to effectively and

retroactively nullify FDA approval of drugs, usurping that agency's authority and undermining

the complex statutory and regulatory mechanisms in place to assure the continued development

of safe and effective drugs.

Relator's tortured thesis is not the law.  Her efforts to shoe-horn her allegations into a

False Claims Act case cannot be sustained.  Both Complaints should be dismissed with prejudice,

pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b).

## BACKGROUND

I.    **THE COMPREHENSIVE FEDERAL STATUTORY AND REGULATORY FRAMEWORK GOVERNING PRESCRIPTION DRUG PRODUCTS**

A.    **FDA Regulation of Prescription Drug Products.**

Congress empowered FDA as the exclusive expert agency regulating prescription drugs.

*Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 627 (1973).  FDA, in turn,

oversees a complex and comprehensive statutory and regulatory framework governing the

development, approval and review of pharmaceutical products.  *See* Federal Food, Drug, and

Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*; 21 C.F.R. §§ 1.1 *et seq.*

Under this framework, a drug manufacturer may not market a new drug unless it has submitted a New Drug Application ("NDA") to FDA and received the Agency's approval.  21 U.S.C. § 355(a).  FDA will approve an NDA only if it determines that the drug meets statutory standards for safety and effectiveness, manufacturing and labeling.  21 C.F.R. § 314.105(c), (d). This determination includes a "strict and demanding" review of the NDA, *Weinberger*, 412 U.S. at 619, including a "comprehensive scientific evaluation of the product's risks and benefits."  71 Fed. Reg. 3922, 3934 (Jan. 24, 2006).  While the statutory standards apply to all NDAs, the wide variety of drugs and their uses "demand flexibility in applying the standards."  21 C.F.R. § 314.105(c).  Thus, FDA must "exercise its scientific judgment to determine the kind and quantity of data and information an applicant is required to provide for a particular drug to meet the statutory standards."  *Id.*

FDA's monitoring of drug safety and effectiveness does not end with approval of an NDA.  Manufacturers must review and file post-marketing reports of "[a]dverse drug experience[s]" with the Agency.  21 C.F.R. § 314.80.  "Adverse drug experiences" include "[a]ny adverse event associated with the use of a drug in humans, *whether or not* considered drug related[.]"  *Id.* § 314.80(a) (emphasis added).  Adverse event reports *do not* establish that an adverse event occurred or that it was caused by a drug which a patient was taking.  *See, e.g.*, S. Rep. No. 109-324, at 6 ("fact of a report of an adverse event is not determinative that the event occurred or that it was caused by a consumer's use of the product"); *see also McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1250 (11th Cir. 2005) (adverse event reports reflect nothing more than "complaints called in by product consumers without any medical controls or scientific assessment" and such reports offer "one of the least reliable sources to justify opinions about both general and individual causation"); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878,

885 (10th Cir. 2005) ("Case reports that state that some [patients exposed to a product] developed [a condition] do not provide an adequate scientific basis from which to conclude that [the products] in fact cause [the condition].").

Adverse event reports fall into two categories:  "alert reports" and "periodic reports."  21 C.F.R. §§ 314.80(c)(1)(i), (c)(2).  Alert reports must be provided to FDA within 15 calendar days from the initial receipt of information and are required only for those adverse events which are both serious and unexpected.  *Id.*  All other previously known adverse events, including serious events already accounted for on the drug label, are reported via periodic reports.  *Id.* § 314.80(c)(2).  *Both* types of reports require the manufacturer to provide details regarding the reported adverse event.  *Id.* §§ 314.80(c)(1)(iii), (c)(2)(ii).  In addition to these adverse event reports, companies may also file regular reports of other field experiences and any information that "might affect the safety, effectiveness, or labeling of the drug."  21 C.F.R. § 314.81.

In addition to manufacturer reporting, FDA also maintains its own safety monitoring database:  the Sentinel System, "a national, integrated, electronic system for monitoring medical product safety."  FDA, *The Sentinel Initiative:  National Strategy for Monitoring Medical Product Safety* (May 22, 2008).[1]  The system expands FDA's access beyond adverse event reports to databases run by private health plans, insurers, and government agencies, thereby enhancing the Agency's ability to observe and respond to potential safety issues.  *See id.* at 4, 18-24.  The system currently tracks drug safety events in nearly 100 million patients, covering over 2.9 billion prescriptions.  FDA's "Mini-Sentinel" safety pilot program is up and running, demonstrating rapid analysis of medical products safety questions (2011).[2]

---

[1] Available at http://www.fda.gov/downloads/Safety/FDAsSentinelInitiative/UCM124701.pdf.

[2] Available at http://www.fda.gov/downloads/Safety/FDAsSentinelInitiative/UCM268035.pdf.

B.        **FDA Enforcement of the FDCA and Food and Drug Regulations.**

The FDCA includes its own enforcement mechanism, entrusting FDA with authority to investigate violations of the FDCA, 21 U.S.C. § 372, and to pursue a variety of sanctions for any fraud it discovers, including withdrawing approval of a drug, 21 U.S.C. § 355(e), 21 C.F.R. § 314.150(a)(2)(iv); injunctive relief, 21 U.S.C. § 332; civil monetary penalties for submission of false and misleading information, 21 U.S.C. § 333(f)(3)(A); and criminal prosecution of the manufacturer, 21 U.S.C. § 333(a).[3]  FDA, in turn, has instituted an administrative policy regarding appropriate measures for responding to false or misleading statements submitted by drug manufacturers.  56 Fed. Reg. 46,191, 46,199-200 (Sept. 10, 1991); *see also* 21 U.S.C. § 355(e)-(h), 21 C.F.R. §§ 314.80, -.81, -.150, -.200.

The United States has *exclusive authority* to enforce the FDCA.  21 U.S.C. § 337(a); *see Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4, 352 (2001) (no private right of action to enforce the FDCA).  However, private citizens concerned with apparent violations of FDCA may seek redress.  FDA has established a general process for private citizens to petition FDA to take administrative action, 21 C.F.R. § 10.30, which may be invoked by any individual who believes a manufacturer has defrauded FDA.  FDA, however, must still investigate and enforce any meritorious citizen complaints.  *Id.*

II.       **THE SUBJECT DRUGS**

All four subject drugs successfully received FDA-approval after adhering to the comprehensive NDA procedures.  Actos® received FDA approval on July 15, 1999.  Actos

---

[3] Enforcement of FDCA reporting and labeling requirements may also be achieved through 18 U.S.C. § 1001, which prohibits persons from making false or fraudulent statements of material fact to federal agencies. Like the FDCA, there is no private right of action to enforce 18 U.S.C. § 1001. *Anderson v. Wiggins*, 460 F. Supp. 2d 1, 7-8 (D.D.C. 2006).

Compl. ¶ 12; FDA, NDA Approval Letter (Jul. 15, 1999).[4]  Actos® subsequently received

supplemental FDA approval on August 4, 2011 (one month before Relator filed her First

Amended Complaint in the Actos action), approving the drug with manufacturer-amended label

warnings for bladder cancer.  FDA, Supplement Approvals (Aug. 4, 2011).[5]  Actos® is used to

treat type 2 diabetes, sometimes known as adult-onset diabetes.  National Center for

Biotechnology Information ("NCBI"), AHFS Consumer Medication Information: Pioglitazone

(Oct. 15, 2011).[6]  Actos® is in a class of medications called thiazolidinediones, which increase

the body's sensitivity to insulin.  *Id.*

Uloric® is used to treat gout, a type of arthritis in which uric acid, a naturally occurring

substance in the body, builds up in the joints and causes sudden attacks of redness, swelling, pain,

and heat.  NBCI, AHFS Consumer Medication Information: Febuxostat (June 1, 2009).[7]

Uloric® is in a class of medications called xanthine oxidase inhibitors that work by decreasing

the amount of uric acid that is made in the body.  *Id.*  Uloric® received FDA approval on

February 13, 2009.  Uloric Compl. ¶ 2; FDA, NDA Approval (Feb. 13, 2009)[8].  Subsequently,

Uloric® received supplemental FDA approval on January 28, 2011, after submitting a

Supplemental New Drug Application updating the Adverse Reactions section on the Uloric®

label with additional post-marketing safety information.  FDA, Supplemental Approval:

Fulfillment of Postmarketing Requirement (Jan 28, 2011).[9]

---

[4] Available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/99/021073A_Actos_appltr.pdf.

[5] Available at http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/021073Orig1s043s044-021842Orig1s014s015-022024Orig1s008s007-021925Orig1s010s011ltr.pdf.

[6] Available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001047/.

[7] Available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000499/.

[8] Available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/2009/021856s000_Approv.pdf.

[9] Available at http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2011/021856s003ltr.pdf.

Prevacid® and Dexilant® are used to treat gastroesophageal reflux disease, a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus.  NBCI, AHFS Consumer Medication Information: Lansoprazole (Feb. 12, 2012)[10], Dexlansoprazole (Feb. 15, 2012).[11]  Prevacid® is also used to treat ulcers and to prevent more ulcers from developing in people whose ulcers have already healed.  *Id.*  The two drugs are both proton pump inhibitors and work by decreasing the amount of acid made in the stomach.  *Id.*  Prevacid® first received FDA approval on May 10, 1995.  *See* FDA, NDA Approval (May 10, 1995).[12]  Dexilant® received FDA approval on January 30, 2009.  *See* FDA, NDA 22-287 Approval (Jan. 30, 2009).[13]

None of the four subject drugs has ever had its approval suspended or withdrawn by FDA.

## III.    MEDICARE, MEDICAID AND TRICARE

Medicare is a federally run health insurance program benefitting primarily those who are 65 years of age and older.  It was not until 2006 that Medicare covered prescription drugs through its amendment by the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 ("MMA").  42 U.S.C. §§ 1395w-101 *et seq.* (2003); *see id.* § 1395w-101(a)(2).  Title I of the MMA amended the Medicare Act by inserting a new Part D, which established Medicare coverage of prescription drugs.  *See id.* §§ 1395w-4 *et seq.*

---

[10] Available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000964/.

[11] Available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000496/.

[12] Available at http://www.accessdata.fda.gov/drugsatfda_docs/nda/pre96/020406_s000_part1.pdf.

[13] Available at http://www.accessdata.fda.gov/drugsatfda_docs/appletter/2009/022287s000ltr.pdf.   At the time Dexilant® was approved it was sold under the name Kapidex®.  To avoid naming confusion with other pharmaceuticals with similar names, the name was changed to Dexilant® in 2010.

Medicaid is a cooperative program between the federal and states' governments to provide medical care to individuals "whose income and resources are insufficient to meet the costs of necessary medical services."  42 U.S.C. §§ 1396 *et seq.*  Once a state is a part of the Medicaid program, it may seek federal payment (known as federal financial participation) for a specified percentage of the amounts "expended . . . as medical assistance under the State plan," including amounts paid for prescription drug coverage.  *Id.* §§ 1396b(a)(1), 1396d(a)(12), 1396d(b).

TRICARE is a federal healthcare program administered by the Department of Defense covering qualifying retired military personnel, their dependants and spouses.  32 C.F.R. §§ 199 *et seq.*; 10 U.S.C. §§ 1079, 1086.  TRICARE provides a pharmacy benefits program to cover drugs included on a uniform formulary.  32 C.F.R. § 199.21(a).

All four subject drugs are reimbursable under Medicare, Medicaid and TRICARE.  (*See, e.g.*, Case no. 10-11043, Dkt. #17 "Actos Compl." ¶¶ 39-42, 91; Case No. 11-10343, Dkt. #28 "Uloric Compl." ¶¶ 114, 140-143.)

## IV.   THE FALSE CLAIMS ACT

The False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, prohibits the submission of false or fraudulent <u>claims</u> to the federal government.  In particular, the FCA imposes liability on any person who "(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] (C) conspires to commit a violation" of the Act.[14]  31 U.S.C. § 3729(a)(1)(A)-(C).  Because the Act attaches liability, not to the underlying

---

[14] Subsection 3729(a) of the False Claims Act was amended by Fraud Enforcement & Recovery Act ("FERA") on May 20, 2009.  *See* Pub. L. No. 111-21, § 4, 123 Stat. 1617, 1621 (2009).  FERA provides that amendments to the FCA take effect upon enactment except for the amendment to the old § 3729(a)(2), which "shall

activity, but to the claim for payment only, the FCA does not create a cause of action for all

allegedly fraudulent conduct affecting the government.  *See U.S. ex rel. Nowak v. Medtronic,*

*Inc.*, 806 F. Supp. 2d 310, 345 (D. Mass. 2011).  Thus, liability under the FCA "does not attach

to violations of federal law or regulations . . . that are independent of any false claim."  *U.S. ex*

*rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 727 (1st Cir. 2007).

     Unlike the FDCA, the FCA permits private citizens known as relators to file a *qui tam*

action on behalf of the United States.  31 U.S.C. § 3730(b).

## V.    RELATOR'S ALLEGATIONS

     Relator was a contractor working for TPUSA from September 2008 to January 2010.

(Uloric Compl. ¶¶ 11, 13.)  On June 18, 2010, Relator filed her first Complaint, under seal,

alleging claims solely relating to the drug Actos®.  (*See* Case no. 10-11043 (the "Actos Case").)

On September 30, 2011, Relator filed her First Amended Complaint in the Actos Case, again

under seal.  (Actos Case, Dkt. #12.)  On February 22, 2012, the United States declined to

intervene in Relator's Actos Case and the case was unsealed.  (*Id.*, Dkt. #13.)  On April 5, 2012,

Relator filed her Second Amended Complaint, which is the operative complaint in the Actos

Case.  (*See* Actos Compl.)

     On March 1, 2011, Relator initiated her second FCA lawsuit against Defendants by filing

a complaint under seal, alleging claims mainly relating to Uloric®, with additional allegations

relating to Prevacid® and Dexilant®.  (*See* Case No. 11-10343 (the "Uloric Case").)  On

---

  (continued…)

take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act . . . that are pending on
or after that date."  FERA § 4(f)(1), 123 Stat. at 1625.  Courts have "almost uniformly interpreted 'claims' to mean
claims for reimbursement."  *Nowak*, 806 F. Supp. 2d at 314 n.1 (quoting *U.S. ex rel. Carpenter v. Abbott Labs, Inc.*,
723 F. Supp. 2d 395, 402 (D. Mass. 2010) (collecting cases)).  Relator's complaints only reference the post-FERA
version of the FCA, and because her allegations pertain almost exclusively to alleged adverse event reports received
during her employment at TPUSA beginning in September 2008, this Court's analysis should focus on the post-
FERA formulation of the FCA.

December 14, 2011, the United States declined to intervene in the Uloric Case and the case was

unsealed.  (Uloric Case, Dkt. #11.)  Relator filed her Second Amended Complaint, the operative

complaint, on March 28, 2012.  (Uloric Compl.)

      Both of Relator's Complaints allege that Defendants violated the False Claims Act by

failing to properly submit certain post-marketing adverse events for the four FDA-approved

subject drugs.  Relator, however, admits that Defendants <u>reported</u> nearly all – if not all – of the

subject adverse events to FDA.[15]  Moreover, Relator admits that all or nearly all of the supposed

adverse events identified in the *qui tam* complaints were already the subject of FDA review or

drug label warnings (*see* Actos Compl. ¶ 60; Uloric Compl. ¶¶ 26, 29-31, 63, 74, 76, 79, 88, 111,

118-119), and that FDA maintained uninterrupted approval of the subject drugs notwithstanding

her allegations.  (*See* Actos Compl. ¶ 12; Uloric Compl. ¶¶ 2, 7, 23.)

      Alleging nothing more than her personal opinion about how she believed TPUSA should

have modified its adverse event reports to FDA (as 15-day "alert reports"), Relator alleges that

Defendants' supposed violation of FDCA's post-marketing reporting requirements rendered

certain claims for government reimbursement somehow "false."  Plaintiff offers two speculative

theories to support her hypothesis of "falsity":

- Had Takeda utilized "alert reports" as opposed to the other FDA reporting methods it
  employed, the FDA may have required drug label amendments and/or additional
  information to be posted in FDA databases.  (*See* Actos Compl. ¶¶ 16, 18, 91-92; Uloric
  Compl. ¶¶ 6, 36, 39, 126-127.)  Plaintiff then opines that these hypothetical additional
  warnings or database entries may have prompted unidentified physicians to prescribe the
  subject drugs less often, potentially resulting in an unspecified decrease in claims for
  reimbursement.  (*See* Actos Comp. ¶¶ 16, 18, 91-92; Uloric Compl. ¶¶ 114.)

---

[15] Actos Compl. ¶ 66 (Takeda reported all congestive heart failure ("CHF") events as "serious" adverse events prior to May 23, 2007 and reported all post-May 23, 2007 CHF events requiring hospitalization as "serious" and all other CHF events as standard adverse events.); Uloric Compl.  ¶¶ 31, 42, 58, 69, 72, 92-93, 96, 100-102, 104-105, 124-125, 127, 131 (alleging Uloric, Prevacid and Dexilant adverse events were transmitted to FDA and available via Adverse Event Reporting System ("AERS") database / MedWatch forms).

- Had Takeda utilized Relator's suggested adverse event reporting methods, FDA may never have approved or, in the alternative, it may have withdrawn approval for the subject drugs – rendering all requests for government reimbursement past and present "false."  (*See* Actos Compl. ¶ 91; Uloric Compl. 43, 66, 114.)

Having stated these two speculative theories, plaintiff then alleges in wholly conclusory fashion that false claims were therefore submitted to the United States in violation of the FCA. (Actos Compl ¶¶ 16, 18, 91-92; Uloric Compl. ¶¶ 43, 66, 114.)

## ARGUMENT

While Relator's Complaints involve four different products, consume more than 200 pages, and allege claims under all three prongs of the FCA[16], along with numerous state false claims acts, the theory underlying all of her claims is rather simplistic.  According to Relator, Defendants did not report adverse drug events for the subject drugs in the manner or with the speed she suggests was required under FDA regulations, and had Defendants done so, FDA could have required additional label warnings (resulting in a decrease in physician prescriptions for the subject drugs) or may have withdrawn approval for the subject drugs altogether – rendering all claims for payment from government health programs "false."

Merit, however, does not follow from Relator's simplistic theories, and they ultimately collapse under the weight of the numerous layers of speculation upon which they are based. *First,* both Complaints fail under Rule 12(b)(6) because Relator fails to plead a plausible FCA violation.  Specifically, the Complaints fail to allege the necessary elements of a "false" claim submitted by a third party medical provider in contravention of a required precondition of

---

[16] Relator has asserted FCA claims pursuant to:  (1) § 3729 (a)(1)(A) alleging that Takeda caused third parties to present false or fraudulent claims for payment to the government (the "Presentment Claims," *see* Actos Compl. ¶¶ 161-166; Uloric Compl. ¶¶ 167-171); (2) § 3729(a)(1)(B) alleging that Takeda knowingly used false records or statements to get a false or fraudulent claim paid (the "Certification Claims," (*see* Actos Compl. ¶¶ 167-170; Uloric Compl. ¶¶ 173-176); and (3) § 3729(a)(1)(C) alleging that TPUSA and TPCL conspired to defraud the government through false claims (the "Conspiracy Claims").  (*See* Actos Compl. ¶¶ 171-176; Uloric Compl. ¶¶ 177-182.)

payment of any government health care program.  Nor do the Complaints allege that Defendants' adverse event reporting was material to any alleged government payment in connection with any claims submitted by health providers regarding the subject drugs.  These failures, taken alone or collectively, mandate dismissal under Fed. R. Civ. P. 12(b)(6).

*Second,* the Complaints also fail to satisfy the heightened Fed. R. Civ. P. 9(b) pleading standard applicable to all federal and state FCA claims.  Relator alleges the existence of a nationwide fraud, involving government payment for all subject drugs, amounting to "hundreds of millions of dollars."  Yet, despite the alleged scope of her claims, Relator does not identify *any* supposedly false claim submitted to a government payor for any of the subject drugs.  Thus, Relator fails to allege the necessary "nucleus" of false claims required to withstand a Rule 9(b) challenge under governing law.  Likewise, other than her unbridled conjecture concerning what she believes FDA might have done given a different set of facts, Relator fails to offer any specifics regarding how her supposed "fraudulent" scheme resulted in the submission of any claims for the subject drugs that were false or had any material effect on any decision to pay a claim for any of the subject drugs – additional grounds for dismissal pursuant to Rule 9(b).

*Finally,* Relator's state law claims are preempted by federal law and, in any event, fail for the same reasons her FCA claims fail.

## I.    RELATOR'S COMPLAINTS MUST BE DISMISSED FOR FAILURE TO STATE AN FCA CLAIM PURSUANT TO RULE 12(B)(6)

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That is, "[f]actual allegations must be enough to raise a right of relief above the speculative level[.]"  *Twombly*, 550 U.S. at 555; *Stagikas v. Saxon*

*Mortgage Servs., Inc.*, 795 F. Supp. 2d 129, 135 (D. Mass. 2011) (same).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556).  Accordingly, dismissal is appropriate if the well-pleaded facts do not "possess enough heft" to warrant an inference of anything more than the mere possibility of misconduct.  *Ruiz Rivera v. Pfizer Pharms., LLC*, 521 F.3d 76, 84 (1st Cir. 2008); *see Iqbal*, 556 U.S. at 678, 129 S. Ct. at 1949.

The analysis the Court should utilize in determining whether Relator has stated an FCA claim sufficient to survive a motion pursuant to Rule 12(b)(6) is the same under §§3729(a)(1)(A), (a)(1)(B), or (a)(1)(C) and asks two questions:  (1) "whether the claims at issue here misrepresented compliance with a precondition of payment so as to be false or fraudulent;" and (2) "whether those misrepresentations were material."  *Nowak,* 806 F. Supp. 2d at 344 (quoting *U.S. ex rel. Hutcheson v. Blackstone Med., Inc.*, 647 F.3d 377, 392 (1st Cir. 2011)); *New York v. Amgen Inc.*, 652 F.3d 103, 111 (1st Cir. 2011).  Because the answer to both questions is a resounding "no," Relator's Complaints should be dismissed.

### A.   Relator Has Not and Cannot Allege The Existence of Any False or Fraudulent Claims.

The FCA "does not impose liability for all fraudulent acts, only for fraudulent claims."  *See Nowak*, 806 F. Supp. 2d at 345 (quoting *United States v. Rivera*, 55 F.3d 703, 709 (1st Cir. 1995)) ("[T]he statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'").  In other words, "[e]vidence of an actual false claim is the *sine qua non* of a False Claims Act violation."  *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 225 (1st Cir. 2004) (quoting *U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.* 290 F.3d 1301, 1311 (11th Cir 2002)); *see Massachusetts v.*

*Schering-Plough Corp.*, No. 03-11865-PBS, 2011 WL 4436969, *3 (D. Mass. Sept. 23, 2011)

("*Hutcheson* does not overrule *United States ex rel. Karvelas*"; the "touchstone" of FCA liability

"must still be a false claim.").  Thus, "[t]o survive this 12(b)(6) motion," Relator is required to

allege that Defendants engaged in a scheme by which "claims submitted to the [government

healthcare] programs misrepresented compliance with a precondition of payment recognized by

those *particular programs*."  *Amgen*, 652 F.3d at 110-11 (emphasis added); *see Hutcheson*, 647

F.3d at 392.  Relator has not and cannot plead facts necessary to make such a showing.

> **1.      Relator has not and cannot plead a misrepresentation of compliance
> with a precondition of payment in connection with submission of a
> claim so as to render any claim false or fraudulent.**

Relator does not allege that Defendants actually submitted any claims to the government.

She instead alleges that certain unidentified doctors, pharmacies and/or other health care

providers potentially submitted claims for Defendants' FDA-approved drugs to government

payors.  Therefore, to allege an FCA claim tied to certification of compliance with FDA

regulations, Relator is required to allege that:  (1) those providers somehow represented that the

subject drugs were in compliance with FDA reporting requirements in connection with their

alleged claims for payment; and (2) compliance with such regulations was a precondition of

payment for claims submitted to the government.  *See Amgen* 652 F.3d at 111 ("The question

here is whether claims submitted [to the government] misrepresented compliance with a

precondition of payment recognized by these programs"); *U.S. ex rel. Nathan v. Takeda Pharm.*

*N. Am., Inc.*, No. 09-1086, 2011 WL 2182422 (E.D. Va. May 4, 2011) (dismissing FCA claim

where relator failed to identify what representations concerning compliance, if any, were

submitted by third party providers to health care programs in connection with claims for

reimbursement).

Relator cannot satisfy either of these two elements.  *First*, Relator does not even attempt to allege that any medical providers certified compliance with FDA regulations relating to adverse event reporting.  *See* 21 C.F.R. §§ 314.80, 314.81.  The shortcoming in Relator's Complaints is highlighted by the contrasting allegations in *Hutcheson*, where relator alleged that the defendant provided unlawful kickbacks to medical providers and that the providers, in turn, falsely certified that their claims for payment were made in compliance with anti-kickback statutes.  *See* 647 F.3d at 392-94.  Unlike the allegations in *Hutcheson*, plaintiff does not allege that any medical provider certified the subject drugs' compliance with any FDCA reporting requirements in connection with a claim for payment.  Thus, Relator's Complaints fall short of alleging that "the claims presented to the government in this case . . . represented that there had been compliance with a material precondition of payment which had not been met," and fail as a matter of law.  *Id.* at 392, 394.

*Second*, Relator has not alleged and cannot allege that certification of compliance with FDA's adverse event reporting regulations was a "precondition of payment" recognized by federal or state health care programs.  Relator's failure to include these allegations is no accident, as compliance with §§ 314.80 and 314.81 is not a precondition for payment under any government program.

Indeed, no authority – not a statute, regulation, contractual condition, or otherwise – suggests that a manufacturer's compliance with FDA post-marketing reporting regulations (or FDA regulations in general) is a precondition for payment from a government health care program.  *See U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 307-08 (3d Cir. 2011) (in order to allege a plausible FCA claim premised on health care providers' alleged failure to comply with Medicare marketing regulations, relators must allege that the

government's payment of claims was conditioned on the providers' compliance with the

Medicare marketing regulations).  Relator's inability to allege otherwise is fatal to her claims.

*See id.* at 309-11 (affirming district court's dismissal of relators' FCA claim on 12(b)(6) grounds

where relators failed to "cite to any regulation," or "examples, in case law or otherwise"

demonstrating that a party's compliance with "marketing regulations is a condition for its receipt

of payment from the [g]overnment" Medicare program); *Amgen*, 652 F. 3d at 115-16 (affirming

district court's dismissal of state FCA cause of action where claims induced by kickback did not

violate a precondition of payment under the state's Medicaid program); *U.S. ex rel. Roop v.*

*Hypoguard USA, Inc.,* 559 F.3d 818, 824 (8th Cir. 2009) (upholding district court's dismissal

because the plaintiff alleged violations of the FDA medical-device-reporting regulations but did

not allege that compliance with those regulations was a prerequisite to payment); *U.S. ex rel.*

*Polansky v. Pfizer, Inc.*, No. 04-cv-0704 (ERK), 2009 WL 1456582, *7 (E.D.N.Y., May 22,

2009) ("mere fact" of "violating FDA regulations does not translate into liability causing a false

claim to be filed").[17]

### 2.     Relator's counterfactual theory of potential FDA withdrawal of approval cannot overcome her inability to plead a false claim.

Unable to allege that compliance with FDA's reporting regulations is a precondition for

payment, Relator instead alleges that all claims for the subject drugs were somehow "false,"

---

[17] Relator's allegations that Medicare, Medicaid, and TRICARE provide express conditions that "no payment may be made . . . for any expenses incurred or services which . . . are not reasonable and necessary for the diagnosis or treatment or illness of injury" do not salvage her claims.  (*See* Actos Compl. ¶ 43; Uloric Compl. ¶ 144-145.)  Relator has not alleged that any of the four subject drugs are not efficacious or are not capable of treating illness or injury.  Nor has Relator alleged that any of the four subject drugs were prescribed to treat conditions which were not indicated on the products' labels.  Thus, Relator offers no allegations that the submission of claims for any of the subject drugs was in violation of an existing precondition for payment and her claims fail as a matter of law. *See Amgen*, 652 F.3d at 110-11; *Hutcheson*, 647 F.3d at 392.

-17-

based on her completely unfounded belief that their approval should be withdrawn by FDA. Relator's speculative legal conclusion fails on multiple levels.

As a threshold matter, there can be nothing "false" about the claims for reimbursement that were actually submitted for the subject drugs by any medical provider, because, regardless of Relator's belief, those products were (and still are) approved by the FDA. *See U.S. ex rel. Clausen v. Lab. Corp. of Am., Inc.* 290 F.3d 1301, 1311 (11th Cir 2002) (liability does not arise under the FCA unless defendant "knowingly asks the Government to pay amounts it does not owe"); *Mikes v. Straus*, 274 F.3d 687, 695 (2d Cir. 2001) ("[A]n improper claim is aimed at extracting money the government otherwise would not have paid"); *see also* Background Section II, *supra* (at all relevant times, all four subject drugs were approved by FDA).  There are no allegations by Relator that FDA (or any source besides the Relator herself) have questioned or found Defendants' compliance with FDA regulations lacking.  Nor does she offer any allegations that any supposed claim for payment for any of the subject drugs was submitted at a time when they did not enjoy full and unequivocal FDA approval.

Relator, therefore, is forced to resort to a counterfactual theory, crafted from entirely speculative allegations.  Specifically, Relator opines that had the FDA supposedly received the post-marketing information alleged by Relator more quickly (or learned of Defendants' alleged reporting practices), that FDA may have withdrawn approval of the subject drugs retroactively, making some or all past prescriptions for those drugs ineligible for government reimbursement. (*See, e.g.*, Actos Compl. ¶¶ 16, 18, 91-92; Uloric Compl. ¶¶ 43, 66, 114.)

Relator, however, alleges no facts supporting her speculation that FDA would have retroactively withdrawn the approval of one, let alone all four of the subject drugs.  *See In re Trasylol Prods. Liab. Litig.*, 763 F. Supp. 2d 1312, 1330 (S.D. Fla. 2010) ("invocation of

-18-

§ 314.80 necessarily requires . . . speculat[ion] as to what the FDA would have done"). Nor does Relator allege any facts that would lead to the conclusion that the submission of additional "alert reports" would have swayed a single physician's decision to prescribe any of the subject drugs. These hypothetical allegations, therefore, fail to meet the pleading standard established by *Twombly* and its progeny. *See* 550 U.S. at 555 (for a complaint to survive a Rule 12(b)(6) challenge, the "[f]actual allegations must be enough to raise a right of relief above the speculative level"); *Sec. & Exch. Comm'n v. Tambone*, 597 F.3d 436, 442 (1st Cir. 2010) ("If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal.").

This type of speculative pleading was rejected by another judge in this District just two months ago, when he dismissed a relator's FCA claim with prejudice based on the *exact same theory* as Relator advances here, advanced by many of the *same attorneys*.[18]  In *Tessitore*, the relator argued that had GlaxoSmithKline ("GSK"), the manufacturer of the antidepressant Paxil, "timely reported the [thousands of] adverse events" received by the Paxil Marketing Program - including reports of birth defects and suicidal behavior - "FDA would have ordered GSK to issue suicide and enhanced birth defects warnings in [a] more timely fashion and those warnings would have resulted in fewer Paxil sales and thus fewer claims for reimbursement." *Tessitore*, __ F. Supp. 2d __, 2012 WL 826889, *2-3, 8 (alleging that GSK failed to report 7000 adverse events regarding suicide and birth defects in the years before FDA required a "black box" warning for Paxil regarding suicidal ideation and issued a public health advisory regarding the "pregnancy category risk profile" of the drug).

---

[18] While the *Tessitore* court's dismissal was pursuant to Fed. R. Civ. P. 9(b),  the arguments apply with equal force here to demonstrate that Relator's allegations fail to satisfy *Twombly's* standards under Rule 12(b)(6).

In dismissing the *Tessitore* complaint, the Court held:

> That argument fails because it presumes, without factual support, that submitting the 7,000 adverse reports would have hastened the FDA's decision to require warnings and that, had such warnings been implemented sooner, physicians would have prescribed Paxil less often between 1999 and 2002.

*Id.* at *8; *see also U.S. ex rel. Gagne v. City of Worcester*, 565 F.3d 40, 42 (1st Cir. 2009) (in assessing a motion to dismiss the Court need not and should not "credit[ ] unsupported conclusions or assertions").

The *Tessitore* court went on to recognize the double and triple layers of unsupported speculation on which the relator's theory of liability relied:

> [W]hile Relator characterizes the alleged adverse reports as involving horrific accounts of suicide and birth defects linked to Paxil, she has provided not a single example of such report or more germanely, how or why a particular report would have affected the FDA's decision to require enhanced warnings in light of other information already available to the FDA.

*Id.* at *9. As demonstrated *supra*, this same mountain of speculation permeates Relator's Complaints here. *See* Background Section V, pages 10-12 *supra*.

There can be no dispute:  FDA approved the subject drugs and has consistently maintained their approval despite its awareness of the alleged adverse events upon which plaintiff wishes to base her case.[19]  *Id.*  Relator's contrary conjecture is wholly disproven by this historic backdrop and her speculation that FDA "would have" acted other than it did ultimately collapses upon itself and demonstrates that Relator cannot allege the existence of any false claim necessary to sustain her FCA causes of action.

---

[19] Further proof of the invalidity of Relator's speculation comes from FDA's supplemental approval of an amended Actos® label in August 2011.  (*See* Background Section II, *supra*.)  The label amendment included a warning regarding an increased "relative risk of developing bladder cancer" by users of Actos®.  *See* FDA, Supplement Approvals 2-3 (Aug. 4, 2011).  This publically available FDA document demonstrably proves that FDA did not and <u>would not</u> have withdrawn approval of Actos® if aware of a possible bladder cancer risk, as FDA provided supplemental approval of the drug knowing of that very risk.  Thus, Relator's speculation is not only legally insufficient, it is also empirically disproven.

### 3. Relator's counterfactual theory is also inconsistent with federal statutes and regulations governing withdrawal of approved drugs.

Not only is Relator's counterfactual theory impermissibly speculative, it is also contrary to the very FDA enforcement mechanisms upon which she seeks to graft it. *See, e.g.*, 21 U.S.C. §§ 355(e)-(h), 21 C.F.R. §§ 314.80, -.81, -.150, -.200. As a threshold matter, Relator's speculation of retroactive withdrawal of drug approval is not permitted by the enforcement provisions of FDCA and FDA regulations. Violations of post-marketing reporting requirements do not carry with them the risk of a retroactive withdrawal of a drug approval or a retrospective recovery of payments made while the drug is FDA-approved. Instead, enforcement of such violations are limited to potentially "prohibit[ing] *continued* marketing of the drug product[.]" 21 C.F.R. §§ 314.80, -.81 (emphasis added); *see* 21 U.S.C. § 355(e)-(h). Nor is prospective withdrawal of drug approval even mandatory. *See* §§ 314.80(j), -81(d) ("FDA may withdraw approval); *see Cutler v. Hayes*, 818 F.2d 879, 893 (D.C. Cir. 1987) ("[t]he [FDCA] imposes no clear duty upon FDA to bring enforcement proceedings to effectuate either the safety or the efficacy requirements of the Act").

Making matters worse, Relator's theory also contravenes mandatory procedural safeguards established by FDCA. In instances where the United States (the only entity empowered to enforce FDCA) seeks to enforce violations of the Act's reporting requirements, it must first provide the manufacturer notice of its enforcement decision, an opportunity for a hearing, a chance to take corrective action in certain circumstances, and the right to appeal an unfavorable ruling to the United States court of appeals upon a fully developed administrative record. *See* 21 U.S.C. §§ 355(e)-(h); 21 C.F.R. §§ 314.150, -.200; *Weinberger*, 412 U.S. at 620 ("To be sure, the [Food Drug and Cosmetic] Act requires FDA to give 'due notice and opportunity for hearing to the applicant' before it can withdraw its approval of [a drug].").

Relator's allegations ignore these imprescriptible safeguards, effectively "short-circuit[ing] the very remedial process the Government has established to address non-compliance with th[e] regulations." *Wilkins*, 659 F.3d 295 at 310.  And by filing this *qui tam* action "based on the [alleged] violation of regulations which may be corrected through an administrative process and which are not related directly to the Government's payment of a claim," Relator "unwisely . . . shift[s] the burden of enforcing the . . . regulations" to herself, even though FDA is "unquestionably better suited than federal court to ensure compliance with the [FDA reporting] regulations." *Id.* at 310-11*; see U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1222 (10th Cir. 2008) ("It would . . . be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures."); *see also U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (holding that FCA may not be used as a substitute for administrative remedies where the regulatory compliance is "not a *sine qua non* [for the] receipt of state funding"); *U.S. ex rel. Lamers v. City of Green Bay*, 168 F.3d 1013, 1020 (7th Cir. 1999) (holding that a qui tam plaintiff may not use the FCA to "preempt" a federal agency's "discretionary decision not to pursue regulatory penalties" stating, "the FCA is not an appropriate vehicle for policing technical compliance with administrative regulations").

Relator, however, need not have circumvented FDA's enforcement authority and safeguards.  Instead, she could have brought her concerns directly to FDA pursuant to long-established citizen petition procedures, 21 C.F.R. § 10.30, allowing concerned citizens to request FDA action.  Through that mechanism, Relator could have requested "any . . . form of administrative action," ranging from a review of Defendants' adverse event reporting practices to "issu[ing] . . . an order" withdrawing approval for one or more of the subject drugs.  *Id.*  Relator,

however, chose to forgo such action for over a year after allegedly learning of Defendants'
supposed reporting practices (and despite her supposed concerns about the alleged health of
patients using the subject drugs), and instead chose to pursue her current *qui tam* actions, and the
attendant possibilities of a massive personal financial recovery.  *See U.S. ex rel. Poteet v. Bahler
Med., Inc.*, 619 F.3d 104, 107 (1st Cir. 2010) (a *qui tam* relator may receive up thirty percent of
the total FCA recovery, creating a considerable "financial incentive" that often "serves to attract"
certain "opportunistic plaintiffs").

This Court should not allow Relator's speculation to extend the scope of the FCA to
effectively undermine long-established federal statutory and regulatory schemes and protections
– and to allow Relator to assert counter-factual theories of liability which FDA itself could not
enforce, effectively circumventing federal law via unproven failure-to-warn claims.  *See
Schering-Plough Healthcare Prods., Inc. v. Schwartz Pharma., Inc.*, 547 F. Supp. 2d 939, 947
(E.D. Wis. 2008) (improper for a plaintiff who is "free to petition FDA" to resolve alleged
regulatory violations by asking "the court to step into the shoes of the FDA"), *aff'd*, 586 F.3d
500 (7th Cir. 2009).

> **B.     Relator Has Not Pled and Cannot Plead That Any Allegedly False Statement
> Was Material to the Submission of a False or Fraudulent Claim.**

In order to properly plead her Section 3729(a)(1)(A) and (B) claims, Relator must also
allege that Defendants' adverse event reporting was "material to the false or fraudulent" claims.
*See* 31 U.S.C. § 3729(a)(2); *U.S. ex rel. Loughren v. Unum Group*, 613 F.3d 300, 307 (1st Cir.
2010).  The First Circuit "ha[s] long held that the FCA is subject to a judicially-imposed
requirement that the allegedly false claim or statement be material."  *Loughren*, 613 F.3d at 307
(citing *United States v. Data Translation, Inc.*, 984 F.2d 1256, 1267 (1st Cir. 1992)); *see
Hutcheson*, 647 F.3d at 393 (rejecting defendant's attempt to combine falsity with materiality).

A statement is material "if it has 'a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed.'"  *Hutcheson*, 647 F.3d at 394 (quoting *Loughren,* 613 F.3d at 307), *Nowak*, 806 F. Supp. 2d at 350 ("a plaintiff must also prove that the defendant intended that the false record or statement be material to the Government's decision to pay or approve the false claim").  In other words, a statement is material if it "represent[s] compliance with a material condition of payment that was not in fact met."  *Hutcheson*, 647 F.3d at 379; *Amgen*, 652 F.3d at 110 (a plaintiff must show, first, "that the claims at issue in this litigation misrepresented compliance with a material precondition of . . . payment").

All of Relator's allegations here involve the alleged reimbursement of FDA-approved drugs.  And because the subject drugs were FDA-approved, all of the unidentified claims for payment that Relator hypothesizes were "false" were payable under Medicare, Medicaid and TRICARE.  The government had no discretion to deny submitted claims under some hypothetical theory of an alleged, unproven FDA violation.[20]  Thus, even accepting all of Relator's allegations as true, she still fails to allege any situation where "the claims at issue in this litigation misrepresented compliance with a material precondition of . . . payment" as all the alleged claims would have been for reimbursement of FDA-approved drugs.  *Amgen*, 652 F.3d at 110.[21]

---

[20] *See* 42 U.S.C. §§ 1395w-101, 1395w-115 (Medicare makes periodic capitated payments to private insurance plans - known as Prescription Drug Plans - who, in turn, must reimburse network pharmacies for their services.); 42 C.F.R. 423.100 (defining "Covered Part D drug"); 42 U.S.C. 1396r-8 (Medicaid program requires coverage for the "medically accepted indication" of "any covered outpatient drug."); *Pharm. Research and Mfrs. Of Am. v. Walsh*, 538 U.S. 644, 684-85 (2003) (a State that has elected to offer prescription drug coverage must cover the drug under its state plan unless it complies with one of the Medicaid Act's provisions that permits a State to exclude or restrict coverage); 10 U.S.C. § 1074g; 32 C.F.R. § 199.21 (TRICARE requires reimbursement of covered drugs).

[21] Relator's allegations are easily distinguishable from the allegations in most other applicable First Circuit FCA cases such as *Amgen,* 652 F.3d 103, *Hutchinson,* 647 F.3d 377, and *Tessitore*, __ F. Supp. 2d__, 2012 WL

Relator's counterfactual allegations fail to salvage her inability to plead materiality much as they could not rescue her failure to plead falsity.  The First Circuit has expressly endorsed the materiality requirement being used as a means of "cabin[ing] the breadth of the phrase 'false or fraudulent'" under the FCA.  *Id.* (quoting *Hutcheson*, 647 F.3d at 388-89).  The Court should appropriately "cabin" Relator's claims.  In order to find materiality, the Court would have to accept a hypothetical chain of events in which Defendants' reporting of adverse events would have caused providers to prescribe the subject drugs less or the FDA to withdraw those drugs' approval.  Such speculation has been rejected by federal courts before, and should be rejected here.  *See U.S. ex rel. Landers v. Baptist Mem'l Health Care Corp.*, 525 F. Supp. 2d 972, 979 (W.D. Tenn. 2007) (finding that although defendants' alleged noncompliance with conditions of participation in the Medicare program may have led to "prospective corrective action or even termination," there was no evidence that defendants would not have received payment of its Medicare claims during periods of noncompliance); *see also Tessitore*, __ F. Supp. 2d __, 2012 WL 826889, *8-9 (relator's allegation that manufacturer's submission of 7,000 additional adverse event reports "would have hastened the FDA's decision to require [additional] warnings" for Paxil, and that such warnings would have caused physicians to prescribe Paxil less, was speculative and "without factual support").  Relator's Complaints fall short of satisfying Rule 12(b)(6) on these grounds as well.

---

(continued…)

826889, which alleged improper kickbacks from the defendant manufacturers to the health care providers.  In those cases, the government had theoretical discretion not to pay the claims because of the kickbacks.  No such scheme is alleged here.  Instead, all that is alleged is that unspecified claims were filed for the four FDA-approved subject drugs.

## II.   RELATOR'S COMPLAINTS MUST BE DISMISSED FOR FAILURE TO MEET FED. R. CIV. P. 9(B)'S HEIGHTENED PLEADING REQUIREMENTS.

It is well settled that the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to FCA cases.  *See Tessitore*, __ F. Supp. 2d __, 2012 WL 826889, at *5 ("FCA claims sound in fraud" and "they must be plead with the specificity required by Fed. R. Civ. P. 9(b)"); *Gagne*, 565 F.3d at 45 (pre-FERA, holding that Rule 9(b) applies to claims under subsections (a)(1), (a)(2), and (a)(3)).  Thus, "a qui tam relator may not present general allegations in lieu of the details of actual false claims in the hope that such details will emerge through subsequent discovery."  *Karvelas* 360 F.3d at 231 (abrogated on other grounds).  "The First Circuit has explicitly rejected this 'allege it now, prove it later' approach in FCA actions."  *U.S. ex rel. Glynn v. Compass Med., P.C.*, No. 09-12124-RGS, 2011 WL 5508916, at *5 (D. Mass. Nov. 10, 2011) (citing *Karvelas*, 360 F.3d at 232-34).

### A.   Relator Fails to Allege The Existence of Any False Claims With Particularity.

"As applied to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity—specifying the 'time, place, and content' of the alleged false or fraudulent representations, means that a relator must provide details that identify particular false claims for payment that were submitted to the government."  *Karvelas*, 360 F.3d at 232; *Gagne*, 565 F.3d at 45 (to satisfy Rule 9(b), relator "must specify 'the time, place and content of the alleged false representation'" (quoting *Rost*, 507 F.3d aat 731)).  Conversely, because "[e]vidence of an actual false claim is the *sine qua non* of a False Claims Act violation," "the failure to identify with particularity any *actual false claims* that the defendants submitted to the government is, ultimately, fatal to [her] complaint." *Id.* at 225, 235 (emphasis added); *Nowak*, 806 F. Supp. 2d at

356-57 (relator "has not alleged *any* fraudulent or false *claim* with particularity.  With no fraudulent or false claim, there is no fraud actionable under the FCA.") (emphasis in original).[22]

In "inducement" cases like this one, where Relator does not allege that Defendants directly submitted false claims for payment, but instead induced third parties to submit false claims, the First Circuit has recognized that to satisfy Rule 9(b), a relator must, at a minimum "provid[e] factual or statistical evidence to strengthen the inference of fraud beyond possibility[.]" *U.S. ex rel. Duxbury v. Ortho Biotech Prods., L.P.*, 579 F.3d 13, 29 (1st Cir. 2009) (quoting *Rost*, 507 F.3d at 733); *see Tessitore*, __ F. Supp. 2d __, 2012 WL 826889, at *6.  However, even in "close call" cases where courts refuse to dismiss claims involving third-party submissions, "the successful relators have identified a nucleus of specific allegedly fraudulent or false claims, or specific, verifiable cases." *Nowak*, 806 F. Supp. 2d at 355; *see U.S. ex rel. Provuncher v. Angioscore, Inc.*, No. 09-12176-RGS, 2012 WL 1514844, *3-4 (D. Mass. May 1, 2012) (Dismissing relator's FCA Section (a)(1)(A) and (B) claims on Rule 9(b) grounds because relator failed to allege "representative transactions with particularity," including any "specific claim that was submitted to the government."); *compare Duxbury*, 579 F.3d at 29-30 (*qui tam* complaint survived rule 9(b) challenge where it identified (1) specific medical providers who allegedly submitted false claims, (2) provided information with respect to the dates and amount of those claims, and (3) identified the government healthcare plan to which the claims were submitted).

---

[22] Since FERA's enactment in 2009, courts around the country, including in this district, have consistently held that to plead a claim under either § 3729(a)(1)(A) or § 3729(a)(1)(B) with sufficient particularity for Rule 9(b), the identification of a false claim for actual payment to the government must be alleged.  *See Provuncher,* 2012 WL 1514844, *4 (citing *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 498, 501 (D.C. Cir. 2004)) (holding that an FCA Section (a)(1)(B) claim fails under Rule 9(b) where it "does not connect any purportedly false statement to a specific claim that was submitted to the government"); *Nowak*, 806 F. Supp. 2d at 343 n.21, 353 ("Presentment may now be a required element of § 3729(a)(1)(B).  While this required element does not alter my analysis under Rule 12(b)(6), it may do so under Rule 9(b)"); *U.S. ex rel. Crennen v. Dell Mktg. L.P.*, 711 F. Supp. 2d 157, 164 (D. Mass. 2010) (granting motion to dismiss under Rule 9(b), noting amendment "seems to suggest that an actual claim is required").

The Complaints do not even approach offering the allegations of these "close call" cases. Despite submitting more than 800 allegations over nearly 230 pages, Relator fails to identify a single false claim that was allegedly submitted to the government as a result of Defendants' alleged conduct.  Nor does Relator allege any "nucleus of specific allegedly fraudulent or false claims."  *Nowak*, 806 F. Supp. 2d at 355.  Relator fails to identify:  (1) a single physician who was allegedly induced to prescribe any of the subject drugs or whose independent medical judgment was somehow compromised by Defendants' alleged post-marketing reporting; (2) when any prescriptions were made; (3) when they were filled by a pharmacy; (4) when and if a claim was submitted for reimbursement; (5) how much those claims were for; (6) whether that claim was submitted to the government or a private payor for reimbursement; (7) what government healthcare plan the claim was submitted to; and (8) whether the government made a payment on any of the subject drugs.

Lacking any specific allegations that might give rise to a false claim on which to moor her case, Relator resorts to casting about conclusory allegations that "[u]pon information and belief, Takeda's fraud has caused tens of thousands of false claims to be made on federal and state health care programs causing the Government to have suffered hundreds of millions of dollars of damages."  (Uloric Compl. ¶ 114; *see id.* ¶ 161; Actos Compl. ¶¶ 5, 85, 90).  Federal courts (in this district and others) have continually found that these types of allegations in FCA cases, absent any details or actual indicia of a false claim, fail to satisfy Rule 9(b) pleading requirements.  *See, e.g.*, *Rost*, 507 F.3d at 726, 732-33 (particularity requirement not satisfied in an inducement *qui tam* complaint which did not identify "any false claim presented by others to any government healthy program or any particular entity or person who actually submitted such a claim"); *Tessitore*, __ F. Supp. 2d __, 2012 WL 826889, *6-7 (*qui tam* complaint failed to

satisfy Rule 9(b) pleading requirements where it failed to provide any information regarding a specific government health program participant responsible for filing a false claim, or the date or amount of any false claim); *Provuncher*, 2012 WL 1514844, *3-4 (dismissing *qui tam* complaint pursuant to Rule 9(b), finding that relator failed to allege the specifics regarding any "representative" false claims); *U.S. ex rel. Loughren v. Unum Provident Corp.*, No. 03-11699-PBS, 2005 WL 6471014, *6 (D. Mass. Oct. 6, 2005) ("The FCA does not permit a relator to simply describe a private scheme in detail and then allege, without stating a valid reason for the allegations, that claims for illegal payments must have, were likely to have, or should have been submitted to the government"); *U.S. ex rel. Wall v. Vista Hospice Care, Inc.*, 778 F. Supp. 2d 709, 715-18 (N.D. Tex. 2011) (finding a statistical inference that Medicaid and Medicare participate in as many as ninety-three percent of related cases insufficient under Rule 9(b) because there was otherwise no "verifiable cases" identifying an alleged false claim).

Relator's blunderbuss allegations alleging some vast scheme by Defendants to defraud FDA does not excuse her inability to plead the existence of false claims with sufficient particularity.  "[R]egardless of the persuasiveness of the showing of the unlawful fraudulent scheme or conduct," Rule 9(b) is not satisfied where relator does not allege at least a "representative sample of false claims." *Nowak*, 806 F. Supp. 2d at 356; *see also Rost*, 507 F.3d at 733 (finding pleading insufficient where "complaint amply describe[d] illegal practices in which [the defendant] allegedly engaged" but "d[id] not sufficiently establish that false claims were submitted for government payment in a way that satisfies the particularity requirement"); *Karvelas*, 360 F.3d at 232 (finding that the "sixteen 'schemes' that [Relator] described in his 93-page complaint" failed to meet the heightened pleading requirements under Rule 9(b)); *Provuncher*, 2012 WL 1514844, *3-4 (finding that relator's general allegation that "[m]ore than

half of the [procedures] involving the [product] were paid by the federal government through Medicare or another federally funded health care program" failed to allege the required specifics of any "representative" false claims).

Much as it is fatal under Rule 12(b)(6), the amount of speculation and conjecture as to what FDA might have done that is necessary to even hypothesize about the *mere possibility* of a false claim under Relator's Complaints is simply too much to satisfy Rule 9(b).  *Tessitore* evidences as much.  __ F. Supp. 2d __, 2012 WL 826889.  In dismissing Relator's claims under Rule 9(b), the court found that the relator's theory there (which is the same as Relator's theory here) asked the court to presume, without factual support, that:  (1) submitting additional adverse reports would have hastened some FDA action; and (2) that doctors would have prescribed the drug less frequently in the face that FDA action.  *Id.* at *8. The *Tessitore* court refused the relator's invitation, instead holding that "[r]elator has neither connected the purported concealment scheme to a false reimbursement claim or a materially false statement, nor shown that the defendants intended to defraud the government.  Her claims thus fail to satisfy Fed. R. Civ. P. 9(b)"  *Id.* at *9.

The Eighth's Circuit's decision in *Roop* dictates the same result.  *See* 559 F.3d at 824-25 (affirming dismissal of FCA claim under Rule 9(b) for failure to "plead with particularity the details of any false Medicare reimbursement claim presented to, or paid by, the United States or its agent.").  After performing a "detailed review" of Relator's allegations, the *Roop* court held that:

> The conclusory allegation that unidentified government agents
> 'would not have reimbursed through Medicare individuals
> submitting claims [for defendant's products] if [they] had known
> of the defects and failure to comply with the rules and regulations
> of the FDA' does not comply with Rule 9(b).  Nor does the
> speculative allegation that [defendant's] products 'would have

been recalled' had [defendant] complied with the [FDA's adverse event reporting] regulations."

*Id*. at 825.

Here, Relator's Complaints are based on this same speculative theory as to what FDA would have done had Defendants reported adverse events as she suggests.  (*See, e.g.,* Actos Compl. ¶¶ 91-92) ("Had Takeda not submitted false reports or records to the FDA, the FDA would have either withdrawn approval of Actos, or would not have recommended Actos . . ., which at a minimum, would have resulted in far fewer submissions of claims for Actos to Government Healthcare Programs."); Uloric Compl. ¶¶ 43, 66, 114.)  As with those cases, Relator's Complaints  do not allege false claims with anything close to the requisite specificity required by Rule 9(b), and should therefore be dismissed.  *See Tessitore,* __ F. Supp. 2d __, 2012 WL 826889, *9; *Roop*, 559 F.3d at 825; *see also Nowak*, 806 F. Supp. 2d at 357 ("Articulating a theory as to how a company *could* violate [the FCA], without more, is insufficient to comply with the requirements of Rule 9(b)." (quoting *Crennen*, 711 F. Supp. 2d at 162)).

### B.    Relator Does Not Plead Materiality with Sufficient Particularity.

Not only do Relator's Complaints fail to allege any false claims that satisfy Rule 9(b), but they also fail to plead materiality with sufficient particularity as well.  Plaintiff's conclusory assertion that Defendants' allegedly delayed submissions to the FDA "cause[d] the United States to continue to pay and approve claims for reimbursement under the Government Healthcare Programs, which claims would not have been reimbursed had CMS known that false representations were made" is insufficient to satisfy Rule 9(b).  (Uloric Complaint at ¶ 174; *see* Actos Compl. ¶ 18.)

Again, *Roop* is instructive.  There, the Eighth Circuit affirmed the district court's dismissal of relator's claims with prejudice based on the relator's allegations that defendant, a

manufacturer of blood glucose monitoring systems, had failed to file reports of defects with the systems with FDA. *Roop*, 559 F.3d at 820. The court held that relator failed to "allege with particularity how any product defect or failure to submit [] reports to the FDA was material to- that is 'capable of influencing'- the government's decisions to pay countless unidentified Medicare reimbursement claims submitted by [defendant's] distributors . . . The conclusory allegation that unidentified government agents 'would not have reimbursed through Medicare individuals submitting claims for [defendant's products] if they had known of the defects and failure to comply with the rules and regulations of the FDA' does not comply with Rule 9(b)." *Id.* at 825.

Relator's Complaints here are similarly devoid of *any* details of how Defendants' allegedly false submissions materially impacted any government decision to pay an allegedly false claim, failing under Rule 9(b). *Id.*; *see Gagne*, 565 F.3d at 47 (relator failed to plead materiality with sufficient particularity where "although the complaint gives details on the time accounts to which City employees allegedly falsely billed their time, such fraudulent reporting is not actionable under the FCA unless it is connected to getting a false or fraudulent claim on the government paid or approved").

## III.   RELATOR'S STATE LAW CLAIMS MUST BE DISMISSED

### A.   Relator's State Law Claims Are Preempted By Federal Law.

Relator's state law claims are preempted by federal law. Relator's state law claims all stem from Defendants' alleged "fraud on the FDA" *vis-a-vis* their alleged failure to report certain serious adverse events attributable to each of the subject drugs as "alert reports." (*See* Actos Compl. ¶¶ 85-92; Uloric Compl. ¶¶ 157-163.) The Supreme Court, however, has held that "state-law fraud-on-the-FDA claims conflict with, and are therefore impliedly pre-empted by, federal law." *Buckman*, 531 U.S. at 348. The Supreme Court explained that "[p]olicing fraud

against federal agencies is hardly a field which the States have traditionally occupied, such as to warrant a presumption against finding federal pre-emption of a state law cause of action." *Id.* at 347 (internal quotations and citations omitted). "To the contrary, the relationship between a federal agency and the entity it regulates is inherently federal in character because the relationship originates from, is governed by, and terminated according to federal law." *Id.*

"Given this analytical framework," the Supreme Court held that state "fraud-on-the-FDA" claims are preempted by federal law (including the FDCA) because they "inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives." *Id.* at 348, 350. The Court stated that the federal statutory scheme empowers FDA to deter and punish fraud against it and that FDA uses that authority to achieve a "delicate balance of statutory objectives" that would be upset by state-law based fraud-on-the-FDA claims. *Id.* The Court noted that FDCA and FDA's implementing regulations impose on applicants various requirements to disclose information to FDA, and at the same time provide FDA the tools necessary to detect, deter and punish false statements or representations made to FDA. *Id.* at 348-49; *see* Background Section I.B, *supra* (discussing FDA's enforcement authorities). The Supreme Court also stated that "[t]he FDCA leaves no doubt that it is the Federal Government rather than private litigants who [is] authorized to file suit for noncompliance" with the FDCA's requirements. *Id.* at 349 n.4; *see* 21 U.S.C. 337(a).

Numerous federal courts have preempted state law "fraud-on-the-FDA" claims in the wake of *Buckman*. *See Stengel v. Medtronic Inc.*, __ F.3d __, 2012 WL 1255040, *3-6 (9th Cir. Apr. 16, 2012) (holding that state law "fraud-on-the-FDA" claim stemming from a manufacturer's alleged failure to report certain dangers associated with its medication pump was subject to *Buckman* preemption); *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d

-33-

374, 378-379 (5th Cir. 2012) (holding that state law claim stemming from manufacturer's alleged "with[olding] of information from the FDA" was preempted, stating "federal law dictates which information the manufacturer is obligated to disclose [to FDA] . . . [a]s a result, disclosures to the FDA are 'uniquely federal' and thus beyond the states' traditional police power.").  And such claims have been preempted regardless of whether the plaintiff made alleged affirmative misrepresentations to and/or withheld information from FDA.  *See Stengel*, __ F.3d __, 2012 WL 1255040, *3-4 ("here the defendant allegedly misinformed the FDA tacitly by failing to report information that it had a duty to report.  The policing of such conduct . . . is committed exclusively to the federal government[.]").

The same result reached by the Supreme Court in *Buckman* and various other federal courts addressing similar state-law "fraud-on-the-FDA" claims must be reached here.  Relator's claims, like those in *Buckman* and its progeny, all stem from her allegations that Defendants failed to comply with the FDCA's adverse event reporting requirements.  (Actos Compl. ¶ 92, *see id.*¶¶ 45-54, 85-89 (citing 21 C.F.R. §§ 314.80, 314.81); Uloric Compl. ¶ 163, *see id.* ¶¶ 23, 146-152, 157-160 (same).)  As the Supreme Court held in *Buckman*, FDA's authority to "police fraud" and to achieve a "delicate balance of statutory objectives" preempts the private state law claims that Relator advances to enforce FDA's drug approval process.  As such, these claims are preempted by the federal law.  *See* 531 U.S. at 348, 350; *Stengel*, __ F.3d __, 2012 WL 1255040, *3-6; *Lofton*, 672 F.3d at 378-379.

### B.    Relator's State FCA Claims Fail Under Fed. R. Civ. P. 9(b).

Relator's state law claims must also be dismissed pursuant to Rule 9(b).  *See, e.g., Rost*, 507 F.3d at 731 n. 8 (same heightened pleading standards of Fed. R. Civ. P. 9(b) apply to state law fraud claims).  To satisfy Rule 9(b), Relator must allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings.  *Nowak*, 806 F. Supp. 2d at 357

-34-

(dismissing Relator's state FCA claims); *Wall*, 778 F. Supp. 2d at 723 (dismissing without prejudice state FCA claims for those states in which the relator "provide[d] no details of the alleged fraud" because "to plead properly, even where the allegations are stated on information and belief, a plaintiff must set forth in the complaint the facts supporting the belief").

The state law claims set forth in the Complaints are largely legal conclusions and add no substantive allegations, but rather repeat and reallege the allegations underlying the federal FCA counts.  (*See, e.g.*, Actos Compl. ¶¶ 177-413; Uloric Compl. ¶¶ 183-419.)  This does not satisfy Rule 9(b).  *Nowak*, 806 F. Supp. 2d at 357 (Dismissing state FCA claims under Rule 9(b), stating "[relator] must allege some specificity with respect to each asserted state and cannot rely upon generalized pleadings. . . .[Relator] fails to identify any specific fraudulent or false claim submitted in any state[.]").

**C.     Dismissal of Relator's Parallel FCA Claims Requires Dismissal of All State Law Claims.**

Finally, dismissal of all state law claims is appropriate upon the dismissal of her FCA claims.  As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal of any supplemental state law claims.  *See, e.g.*, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f federal claims are dismissed before trial, . . . the state claims should be dismissed as well); *Martinez v. Colon*, 54 F.3d 980, 990 (1st Cir. 1995) (affirming the dismissal without prejudice of pendent claims when the district court determined "far in advance of trial that no legitimate federal question existed").  Given the shortcomings in Relator's federal claims, no reason exists here for the Court to exercise supplemental jurisdiction over Relator's state law claims and those claims should be dismissed.  *See id.; Marrero-Gutierrez v. Molina*, 491 F.3d 1, 7-8 (1st Cir. 2007) (affirming dismissal of state law claims); *U.S. ex rel. Wilkins v. United Health*

*Group, Inc.*, No. 08-3425, 2010 WL 1931134, *6 (D.N.J. May 13, 2010) (declining to exercise

supplemental jurisdiction over state law claims where federal FCA claim subject to dismissal).

Thus, for all the reasons set forth above, the state law claims contained in Counts IV

through XXVII of the Actos and Uloric Complaints must also be dismissed.

## CONCLUSION

WHEREFORE, Defendants Takeda Pharmaceutical Company Limited and Takeda

Pharmaceutical U.S.A., Inc., respectfully request this Court to dismiss Plaintiff's Second

Amended Complaints.


Dated: May 11, 2012

Respectfully submitted,

DEFENDANTS TAKEDA PHARMACEUTICAL
COMPANY LIMITED AND TAKEDA
PHARMACEUTICALS U.S.A., INC., f/k/a TAKEDA
PHARMACEUTICALS NORTH AMERICA, INC.,

By their counsel,

/s/Christopher M. Morrison
Christopher M. Morrison (BBO #651335)
JONES DAY
100 High Street, 22nd Floor
Boston, Massachusetts 02110
Telephone:  (617) 960-3939
Facsimile:  (617) 449-6999
cmorrison@jonesday.com

| |
|---|
| **CERTIFICATE OF SERVICE**<br><br>I, Christopher M. Morrison, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on May 11, 2012.<br><br>/s/ Christopher M. Morrison<br>Christopher M. Morrison |

Lee Ann Russo
Morgan R. Hirst
JONES DAY
77 West Wacker Drive, Suite 3500
Chicago, Illinois 60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
larusso@jonesday.com
mhirst@jonesday.com