**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| United States Of America, et al. ex rel. Helen Ge, M.D.<br><br>    Plaintiffs And Relator,<br><br>v.<br><br>Takeda Pharmaceutical Company Limited, And Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc.<br><br>    Defendants | Civil Action No.  10-11043-FDS<br><br>**LEAVE TO FILE 40 PAGES GRANTED 7/16/12**<br><br>**ORAL ARGUMENT REQUESTED** |
| United States Of America, et al. ex rel. Helen Ge, M.D.<br><br>    Plaintiffs And Relator,<br><br>v.<br><br>Takeda Pharmaceutical Company Limited, And Takeda Pharmaceuticals U.S.A., Inc., f/k/a Takeda Pharmaceuticals North America, Inc.<br><br>    Defendants | Civil Action No.  11-10343-FDS |


**RELATOR'S OPPOSITION TO DEFENDANTS' JOINT MOTION TO
DISMISS RELATOR'S SECOND AMENDED QUI TAM COMPLAINTS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................1

SUMMARY OF FACTS ......................................................................................................2

I.     TAKEDA CONCEALED AND MISREPORTED BLADDER CANCER
      AND CHF RISKS ASSOCIATED WITH ACTOS ...........................................................3

II.    TAKEDA FAILED TO REPORT SERIOUS DRUG-ON-DRUG
      ADVERSE INTERACTIONS ASSOCIATED WITH ULORIC,
      PREVACID AND Dexilant ........................................................................................5

PURPOSE OF THE LAW ...................................................................................................8

ARGUMENT .....................................................................................................................12

I.     TAKEDA'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE
      RELATOR'S COMPLAINTS STATE A PLAUSIBLE CLAIM UNDER
      THE FALSE CLAIMS ACT ..........................................................................................12

      A.     Takeda's False Representations in Its New Drug Application/Certification
            And Its Knowing Concealment of Adverse Event Reports and
            Misrepresentations Regarding The Safety Profile of Its Implicated
            Drugs Resulted In False Claims Being Presented To The
            Government By Innocent Physicians.....................................................................14

      B.     Relator's Allegations Are Not Speculative Because, Under Federal Law,
            a Drug Manufacturer Is Not Allowed To Sell Its Drugs Without Certifying
            to the FDA That It will Comply With All Adverse Event Reporting
            Requirements .......................................................................................................19

      C.     Contrary to Takeda's Arguments, Courts Within This Circuit Have
            Recognized that A Drug Manufacturer's Violations of the FDCA Can
            Result In Drug Manufacturer's Liability Under the FCA.....................................21

      D.     Takeda's Violations of Its Adverse Event Reporting Obligations and
            Its Overt Misrepresentations Regarding The Safety of The Implicated
            Drugs Are Presumptively Material To the Government, Regulators
            and the Medical Community..................................................................................21

II.    RELATOR HAS ALLEGED HER CLAIMS WITH SUFFICIENT
      PARTICULARITY AND IN COMPLAINCE WITH THE REQUIREMENTS
      OF RULE 9(B)..............................................................................................................23

A.      Relator Has Alleged Her Claims Regarding the Concealment of Adverse Events With Sufficient Particularity To Allow Takeda To Prepare A Meaningful Response.........................................................................................24

B.      The *Tessitore* Decision is Factually Distinguishable Because, Unlike Dr. Ge, the Relator In Tessitore Was Not A Pharmaceutical Company Insider and Did Not Have the Detailed Allegations As Does Dr. Ge....................28

III.    RELATOR'S STATE LAW FALSE CLAIMS ACT CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW.................................................................................34

REQUEST FOR LEAVE TO AMEND.........................................................................................36

REQUEST FOR ORAL ARGUMENT .........................................................................................36

CONCLUSION.................................................................................................................................37

# TABLE OF AUTHORITIES

**Page**

### CASES

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)........................................................................................................12

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................................................12

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U.S. 341 (2001)....................................................................................................34, 35

*Cook County v. United States ex rel. Chandler*,
    538 U.S.119 (2003)........................................................................................................11

*Foman v. Davis*,
    371 U.S. 178 (1962)........................................................................................................36

*Garside v. Osco Drug, Inc.*,
    976 F.2d 77 (1st Cir. 1992)............................................................................................23

*In re Pharm. Indus. Average Wholesale Price Litig.*,
    321 F. Supp. 2d 187 (D. Mass. 2004) ......................................................................34-36

*Knowlton v. Dessert Medical, Inc.*,
    930 F.2d 116 (1991)........................................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
    131 S.Ct. 1309 (2011)..............................................................................................19, 23

*Neder v. United States*,
    527 U.S. 1 (1999)............................................................................................................21

*New York v. Amgen Inc.*,
    652 F.3d 103 (1st Cir. 2011)................................................................................ *passim*

*O'Connell v. Hyatt Hotels of P.R.*,
    357 F.3d 152 (1st Cir. 2004)..........................................................................................36

*Pierce v. Underwood*,
    487 U.S. 552 (1988)........................................................................................................19

*Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*,
    628 F.3d 25 (1st Cir. 2010)............................................................................................12

*U.S. ex rel. Bierman v. Orthofix Intern., N.V.*,
   748 F.Supp.2d 123 (D.Mass. 2010) ......................................................................... *passim*

*U.S. ex rel. Allen v. Guidant Corp.*,
   2012 WL 878023 (D. Minn. Mar. 14, 2012) ...................................................................29

*U.S. ex rel. Franklin v. Parke-Davis*,
   147 F.Supp.2d 39 (D.Mass. 2001) ............................................................................ *passim*

*U.S. ex rel. Grubbs v. Kanneganti*,
   565 F.3d 180 (5th Cir. 2009) .........................................................................................24

*U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*,
   352 F.3d 908 (4th Cir. 2003) ...........................................................................18, 20, 32

*U.S. ex rel. Hendow v. University of Phoenix*,
   461 F.3d 1166 (9th Cir. 2006) ................................................................................. *passim*

*U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.*,
   647 F.3d 377 (1st Cir. 2011) .......................................................................................14, 17

*U.S. ex rel. Johnson v. Shell Oil Co.*,
   183 F.R.D. 204 (E.D.Tex.1998) ..................................................................................24, 25

*U.S. ex rel. Jones v. Brigham & Women's Hosp.*,
   678 F.3d 72 (1st Cir. 2012) ..................................................................................13, 21, 22

*U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*,
   360 F.3d 220 (1st Cir.2004) ..........................................................................................17

*U.S. ex rel. Kirk v. Schindler Elevator Corp.*,
   601 F.3d 94 (2d Cir.2010) .............................................................................................13

*U.S. ex rel. Loughren v. Unum Group*,
   613 F.3d 300 (1st Cir. 2010) .........................................................................................9

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
   570 F.3d 849 (7th Cir. 2009) ...........................................................................24, 25, 27

*U.S. ex rel. Luther v. Consol. Indus., Inc.*,
   720 F. Supp. 919 (N.D. Ala. 1989) ...............................................................................8

*U.S. ex rel. Main v. Oakland City Univ.*,
   426 F.3d 914 (7th Cir. 2005) .................................................................................. *passim*

*U.S. ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943)...........................................................................................9

*U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
    238 F.Supp.2d 258 (D.D.C.2002) .................................................................24

*U.S. ex rel. Roop v. Hypoguard*,
    559 F.2d 818 (8th Cir. 2009) .......................................................................33

*U.S. ex rel. Rost v. Pfizer, Inc.*,
    507 F.3d 720 (1st Cir.2007).........................................................13, 28, 36

*U.S. ex rel.  Rost v. Pfizer*, Inc.,
    253 F.R.D. 11 (D.Mass. 2008).....................................................................27

*U.S. ex rel. Strom v. Scios, Inc.*,
    676 F.Supp.2d 884 (N.D.Cal. 2009) ...........................................................27

*U.S. ex rel. Tessitore v. Infomedics, Inc.*,
    __F.Supp.__2012 WL 826889 (D.Mass., March 12, 2012) .................... *passim*

*U.S. ex rel. Westmoreland v. Amgen, Inc.*,
    738 F.Supp.2d 267 (D.Mass. 2010) .....................................................13, 27

*U.S. v. Monsanto*,
    491 U.S. 600 (1989).....................................................................................19

*U.S. v. Neifert–White*,
    390 U.S. 228 (1967).......................................................................................9

*U.S. v. President & Fellows of Harvard Coll.*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ..........................................................32

*U.S. v. Rule Indus., Inc.*,
    878 F.2d 535 (1st Cir. 1989).........................................................................32

*U.S. v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C.Cir.2010)......................................................................14

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ..........................................................................24

*Wyeth v. Levine*,
    555 U.S. 555 (2009)......................................................................................20

## STATUTES

Pub.L. No. 111–21, 123 Stat. 1617 (2009) ............................................................11, 14

FED.R.CIV.P, Rule 9(b) .................................................................................. *passim*

FED.R.EVID., Rule 201 ...............................................................................................29

21 C.F.R. 314.80 ........................................................................................................17

21 C.F.R. 314.81 ........................................................................................................17

21 U.S.C. § 331(e) ......................................................................................................33

21 U.S.C. § 333(a) ......................................................................................................33

21 U.S.C. § 355(a) ...........................................................................................17, 21, 34

21 U.S.C. § 355(e) ...........................................................................................18, 21, 35

21 U.S.C. § 355(k) ......................................................................................................33

31 U.S.C. §§ 3729, et seq............................................................................... *passim*

Wall, False Claims Reform Act, 60 WISC.B.BULL. 16 (Oct. 1987) .............................10

S.Rep. No. 99–345 (1986), *as reprinted* in 1986 U.S.C.C.A.N. 5266...........................20

## INTRODUCTION

Caught red-handed in the midst of a long-standing scheme to fraudulently conceal and distort serious adverse events associated with its blockbuster prescription drugs, Takeda in its motion to dismiss variously misinterprets the False Claims Act ("FCA"), expends unnecessary effort in an untenable challenge to Relator's bona fides to bring suit, avoids discussion of allegations more than sufficient to satisfy Rule 9(b), and advances an unprecedented theory of preemption that would preclude whistleblowers from recovering funds for the Government where a company lies to the FDA and falsely promotes its product to the medical community. Takeda asks this Court to erect unreasonable and unprecedented barriers to *qui tam* lawsuits under the FCA which suits seek to, and often do, recover taxpayer dollars wrongly paid as a result of the unlawful conduct and machinations of defendants like Takeda.  This, from a corporate defendant already forced to pay hundreds of millions of dollars for prior violations of the FCA, and already the subject of Corporate Integrity Agreements ("CIA"s) with the United States as set forth below.  Not unlike many of the other pharmaceutical companies that have been found liable under the FCA, Takeda sees the contingent risk associated with paying damages for violations of the FCA as a mere cost of doing business – a cost nearly always outweighed by the economic gain from its fraudulent enterprise and false promotion.

In 1863, long before creation of the FDA or the implementation of the Food, Drug, and Cosmetic Act ("FDCA"), the FCA was enacted to protect the public against fraud on the Government.  Takeda's activities involving its family of prescription drugs are a classic example of what the FCA and state false claims acts empower whistleblowers to help governments combat.  As alleged in the Complaints, Takeda for several years has implemented a policy of underreporting and misreporting the serious side effects associated with its blockbuster drugs,

1

including but not limited to Actos (prescribed for Type-II diabetes) and Uloric (prescribed for gout), in violation of FDCA and FDA regulations.  Takeda's failure to truthfully report the serious adverse events associated with its drugs and its false overt promotion regarding the safety of its drugs, has caused the medical community to believe the drugs are safer than they really are, including that they are safer than alternative drug therapies, resulting in more prescriptions to patients, many of whom are covered by government health care programs, including Medicare (which covers the elderly), Medicaid (which covers the impoverished) and TRICARE (which covers military personnel and their families).  These actions violated Sections 3729(a)(1)(A) and (a)(l)(B) of the FCA, and this action seeks to recover funds wrongly paid as a result.

Takeda's effort to dismiss Relator's case in toto at the pleading stage fails for the reasons that follow.  First, as to the 12(b)(6) challenges, Takeda's contention that its failure to properly report serious adverse events does not amount to an FCA violation is fundamentally flawed as evidenced by the Government's recent multi-million dollar settlements for identical conduct as described herein.  Second, because the Complaints provide a first-hand, detailed account of Takeda's fraudulent scheme, Relator more than satisfies the pleading requirements of Rule 9(b), as made plain by recent Circuit authority as set forth below.  Lastly, equally untenable is Takeda's rejected preemption argument, the unwarranted application and expansion of which would categorically preclude use of the FCA by relators, and use by any State of its own false claims law, to recover for false claims paid where a defendant's conduct also violates the FDCA.

## SUMMARY OF FACTS

Takeda is an international drug manufacturer whose arsenal of drugs includes *Actos* (used to treat type II diabetes), *Uloric* (used to treat gout), *Prevacid* and *Dexilant* (both are proton-pump inhibitors used to treat gastro esophageal reflux disease–GERD).  Actos initially received

FDA approval in July 1999, Uloric in February 2009, Dexilant in January 2009 and Prevacid in May 1995.  See Actos Complaint at ¶12; and Uloric Complaint at ¶ 2.  Dr. Ge is a former medical reviewer in Takeda's pharmacovigilance division where she was responsible for reviewing incoming adverse event reports and identifying and evaluating potential safety signals for certain Takeda drugs, including the four drugs implicated in this FCA action.  See Actos Complaint at ¶¶ 6, 7; and Uloric Complaint at ¶ 12.

## I.   TAKEDA CONCEALED AND MISREPORTED BLADDER CANCER AND CHF RISKS ASSOCIATED WITH ACTOS

Actos is Takeda's trade name for its multi-billion dollar blockbuster drug "pioglitazone." Actos (pioglitazone) is a prescription drug within a class of drugs known as thiazolidinediones ("TZDs"), which are prescribed for the treatment of Type II diabetes.  Today, the two primary TZDs marketed in the United States are Actos (manufactured by Takeda) and Avandia (rosiglitazone), which is manufactured and distributed by GlaxoSmithKline LLC ("GSK").  See Actos Complaint at ¶ 11.

Actos developed into Takeda's most profitable drug with $3.1 billion annual sales in 2008 and $3.4 billion annual sales in 2009, according to an April 6, 2010 IMS Health report.  *Id.* at ¶ 13.[1]   At its peak, Actos alone was responsible for more than half of the total revenue of Takeda Pharmaceuticals North America.  *Id.*   Takeda was able to capture a majority of the diabetes drug market by falsely portraying Actos as safer than it actually was, including that it was safer than the competitor drug, Avandia.  Actos, however, is not as safe as Takeda has led the FDA, healthcare professionals and the general public to believe.  Rather, the FDA and the

---

[1]   According to statistics released by the Centers for Medicare and Medicaid Services ("CMS"), approximately a third of all Actos sales were paid for by the Government.  Specifically, in 2008, the federal government paid  $1,062,975,106.90 for Actos;  and in 2009, the government paid $1,188,291,746.38 for Actos.  See Exhibit 1.

public were led to believe that Actos is safer because Takeda failed to properly report all of the Actos-related serious adverse events to the FDA.

As way of example, Dr. Ge, as an Actos safety reviewer, had direct knowledge of the Actos bladder cancer risk but encountered resistance from her superiors when she tried to report bladder cancer as related to Actos. *Id.* at ¶8. On multiple occasions, Dr. Ge's supervisors directed her to change her "related" assessment to unrelated and, in addition, numerous bladder cancer cases were *never* reported to the FDA. *Id.*

In addition to concealment and under-reporting of the bladder cancer risks, Takeda also failed to properly report each Actos-related Congestive Heart Failure ("CHF") adverse event to the FDA. *Id.* at ¶¶ 9. Specifically, Takeda instructed its medical reviewers not to report hundreds of non-hospitalized or non-fatal CHF cases as "serious" adverse events and thus avoided its responsibility of accurately analyzing and reporting these hundreds of serious adverse events to the FDA. *Id.* Based upon her observations while at Takeda, Dr. Ge estimates that Takeda failed to report several hundred CHF events as "serious" between late 2007 and 2010.[2] *Id.* When Dr. Ge complained to her superiors that her medical assessments were being downgraded from "serious" to "non-serious" and that, as a result of this, the CHF events were being under-reported to the FDA, her contract with Takeda was terminated. *Id.* at ¶10.

Takeda's failure to properly and accurately report hundreds of serious adverse events caused the FDA to falsely view Actos as safer than it really was. In an October 7, 2008 report, Dr. David J. Graham, the Associate Director for Science and Medicine, Office of Surveillance and Epidemiology at the FDA commented that "there was strong evidence that rosiglitazone [Avandia] confers an increased risk of AMI and heart failure compared to pioglitazone [Actos]."

---

[2] To illustrate the magnitude of this failure, between 1999 and 2009, the manufacturer of Avandia (a competing diabetes drug) reported a cumulative total of 2,628 Congestive Heart Failure adverse events during that 10 year period. See Actos Complaint at ¶ 9.

Further, in a May 2010 observational study, Dr. Graham and colleagues compared Avandia to Actos and, in the absence of accurate adverse event numbers for Actos CHF events due to Takeda's mis-categorizations, the authors projected excess "serious cardiovascular harm or death as a result of using Avandia instead of Actos."  *Id.* at ¶¶ 16.  Had Takeda not submitted false reports or records to the FDA, and had it properly reported Actos' known serious adverse reactions, the FDA and the public would not have been misled regarding the safety of Actos, which, at minimum, would have resulted in far fewer submissions of claims for Actos to Government Healthcare Programs.[3]  *Id.*

## II.    TAKEDA FAILED TO REPORT SERIOUS DRUG-ON-DRUG ADVERSE INTERACTIONS ASSOCIATED WITH ULORIC, PREVACID AND DEXILANT

With respect to Uloric, Prevacid and Dexilant, several unlabeled fatal and life-threatening adverse reactions have been known to Takeda to occur as a result of these drugs' interaction with other drugs commonly used by the same patient population.  Uloric Complaint at ¶3.  Notwithstanding, the drugs' package inserts encourage their co-administration with other commonly used drugs, deny the drug interaction or downplay the interaction.  The post-marketing adverse events are consistent with the pre-approval data showing the risk, but Takeda has not revised these drugs' labels accordingly.  Millions of patients have been placed at risk and harmed as a result of this misleading conduct as doctors prescribe these drugs oblivious to their dangerous interactions with the drugs their patients are already taking.  *Id.*.

Relative to Uloric, Takeda caused the government to overpay for gout treatment by diverting tens of thousands of gout patients away from allopurinol, another gout medication, at 10 cents a day to Uloric at $5.00 a day.  Takeda did this by improperly and illegally suppressing

---

[3]  As way of example, when Avandia's cardiovascular risks were publicized, Avandia lost approximately 65% of its sales.  In contrast, because of Takeda's concealment of Actos' risks, sales of Actos were not negatively impacted.  *Id.* at ¶94.

Uloric adverse event reporting and, consequently, failing to alert physicians of Uloric's risks, beginning with the New Drug Application ("NDA") and continuing post-approval. *Id*. at ¶4. Had Takeda properly reported Uloric's adverse reactions, the unsafe drug interactions for the gout patient population would have undermined Uloric's claimed advantages over allopurinol, which ostensibly justified the added expense. *Id*. Acutely aware of its precarious marketing posture relative to a cheaper, safer, established gout treatment, Takeda resorted to deceitful reporting relative to (1) fatal drug interactions with auto-immune drug treatments, (2) severe and fatal bleeding due to warfarin interactions and (3) renal failures, each of which are related to prevalent co-morbidities for gout patients. *Id*. On each of these points, Takeda knowingly and falsely claimed, and its labeling indicated, a marketing advantage over allopurinol. In order to obtain, and retain, government payment for Uloric gout treatment, the company evaded accurate reporting of the adverse events related to these claimed marketing superiorities. The evidence demonstrates Takeda knowingly hid and/or minimized these risks for pure economic reasons. *Id.*

Amongst the drugs Takeda has avoided properly reporting serious adverse events resulting from their interactions are Imuran, Methadone, Digoxin, Warfarin (Coumadin) and the drug class of Statins, all commonly given to the same elder patient population. *Id*. at ¶5. The general mechanism for these serious adverse events is that patients are prescribed and consume a safe plasma level for a drug, but adding Uloric, Kapidex/Dexilant or Prevacid interferes with the metabolism of the initial drug, the initial drug does not break down at its expected rate, thereby increasing its plasma concentration to toxic levels while taking what had been established as a safe dose of the initial drug. *Id*. Accordingly, if a drug like Imuran is taken at normal dose levels, it limits hyperactive auto-immune responses that lead to intolerable rheumatoid arthritis or bullous pemphigoid (painful skin blisters). *Id.* However, if the proper dose of Imuran is not

normally metabolized due to administering a drug like Uloric, the plasma concentration for the Imuran gets so high that it suppresses all immune response and causes bone marrow suppression, one of the most serious, direct adverse drug events.  *Id*.  The problem is that people suffering from auto-immune diseases are also likely to suffer gout or GERD, therefore, unless properly warned, physicians can be misled into causing toxic plasma concentrations of one drug while maintaining its established, ostensibly "safe" dose, due to adding Uloric or Kapidex/Dexilant. *Id*.

Bleeding events reported from the interaction between Prevacid or Dexilant with Plavix were often brought up by specialists at Pharmacovigilance Department meetings chaired by Janet Johnston every Wednesday.  *Id*. at ¶6.  Dr. Ge voiced her concerns regarding such interactions to Ms. Johnston and other product managers many times.  *Id*.  Dr. Ge told them that both Plavix and Warfarin, together with other drugs, such as Digoxin and Imuran, are all NTR drugs (narrow therapeutic range), so small changes in plasma levels caused by drug interactions with Takeda drugs could be dangerous.  *Id*.  Therefore, information regarding the interaction risks, along with related post-marketing adverse events, needed to be updated on the Dexilant, Prevacid and Uloric labels for safe use.  Dr. Ge emphasized that this was the reason why pharmacovigilance is needed.  Dr. Ge's recommendations, however, all went unheeded.  *Id*.  Rather, realizing that Uloric (which has been heavily promoted in television direct-to-consumer advertising), could potentially become a billion dollar a year drug within the foreseeable future, Takeda did everything in its power to conceal and downplay any serious safety risks that could jeopardize sales of its "groomed-to-be" blockbuster drug.  *Id*. at ¶¶ 7.  In that regard, Takeda under-reported serious adverse events related to Uloric use, some of which required expedited 15 day reporting to the FDA, but were not so reported.  *Id*..  In several of these failures to report adverse events,

Relator Dr. Helen Ge attempted to correctly report them, but her submissions were changed or she was directed to change them to avoid Takeda having to transmit the 15 day expedited report or serious adverse event reporting required for the its Periodic Adverse Event Reports to the FDA. *Id.* Ultimately, Dr. Ge's contract with Takeda was terminated for recommending or attempting proper reporting and labeling of adverse events related to these drugs. *Id.*

But for Takeda's fraud, Government health care programs would have paid for substantially fewer claims of these Takeda drugs. See Actos Complaint at ¶¶ 16, 18, 90-96 and Uloric Complaint at ¶¶114, 161-163. But for the fraud, physicians would have prescribed these drugs, including but not limited to Actos and Uloric, far less frequently than they did or not at all, and patients would have used the medications less than they did or not at all. *Id.* Takeda understood that, by concealing the adverse events, it would secure billions of dollars in profits and market share from its sales of these drugs. As Vice President of Takeda's Pharmaco-vigilance Department, Dr. Maria Paris, emphatically stated during a meeting in which she encouraged the downplaying of adverse event reports: "As a company, reporting adverse events is one thing, but we must make sure that the company has to be profitable first." See Actos Complaint at ¶¶ 15, 80.

## PURPOSE OF THE LAW

The False Claims Act was enacted after a series of sensational Congressional inquiries unearthed numerous instances of defense contractor fraud against the Union Army during the Civil War. The law was meant to punish such practices as the mixing of gunpowder with sawdust. Wall, False Claims Reform Act, 60 WISC.B.BULL. 16 (Oct. 1987); *see also U.S. ex rel. Luther v. Consol. Indus., Inc.*, 720 F. Supp. 919, 921 (N.D. Ala. 1989). "The chief purpose ... was to provide for restitution to the government of money taken from it by fraud." *United States*

*ex rel. Marcus v. Hess*, 317 U.S. 537, 551 (1943). "To achieve this, the statute reaches beyond 'claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." *United States v. Neifert–White*, 390 U.S. 228, 233 (1967). The False Claims Act was amended by the "False Claims Amendments Act of 1986," Pub.L. No. 99–562, § 2, 100 Stat. 3153 (codified as amended at 31 U.S.C. §§ 3729–33) (1986). The amendments' purposes were to further deter Government fraud through increased civil penalties and damages; unify judicial interpretations of the Act's liability standard; and stimulate private citizen assistance in halting government fraud through *qui tam* actions. Amongst the 1986 amendments included definitions of the terms "knowing" and "knowingly" which expressly state that "no proof of specific intent to defraud is required." 31 U.S.C. § 3729(b)(1). In 2009, Congress passed the Fraud Enforcement and Recovery Act of 2009 ("FERA") which made further changes to the FCA's liability, retaliation and civil investigative demand provisions. "The intended effect of these amendments was to expand liability and to make it easier to conduct investigations and win recoveries under the FCA, primarily by eliminating defenses the courts had developed since the 1986 amendments." See 1 John T. Boese, *Civil False Claims and Qui Tam Actions*, § 1.09 (4th ed. 2012).[4] In sum, the purpose of the FCA and its subsequent amendments was to "provide protection against those who would 'cheat the United States'" and liability was intended "to reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government." *U.S. ex rel. Marcus v. Hes*s, 317 U.S. 537, 544-45 (1943); *see also U.S. ex rel. Loughren v. Unum Group*, 613 F.3d 300, 305-06 (1st Cir. 2010) ("The FCA covers all fraudulent attempts to cause the government to pay out sums of money") (internal citations omitted).

---

[4]  In addition, in 2010, Congress passed the Patient Protection and Affordable Care Act ("PPACA") which, among other things, amended the FCA's public disclosure bar and expanded the original source exception to the bar in Section 3730(e)(4)(B).

While defense contractors were the original target of the FCA, in the last decade, as health care costs have overtaken military spending, the government and *qui tam* relators have successfully utilized the FCA to combat health care fraud and specifically fraud perpetuated by the pharmaceutical industry.  Today, the top FCA settlements are settlements against pharmaceutical companies who have violated the Food Drug and Cosmetic Act ("FDCA").  They include FCA civil settlements against Pfizer ($1 billion), Merck ($650 million), GlaxoSmithKline ("GSK") ($600 million), Serono ($567 million), TAP ($559 million), Eli Lilly ($438 million) and Abbott Laboratories ($400 million).[5]  These figures do not include the additional substantial criminal fines these same entities paid on top of their aforementioned FCA settlements.  Just two-weeks ago, the Department of Justice announced that it had entered into a $3 billion settlement with GSK ($2 billion for its civil liabilities and $1 billion in criminal penalties) to resolve civil FCA liabilities arising out of its violations of the FDCA (including, among other things, allegations that GSK failed to report serious adverse event reports associated with its diabetes drug, Avandia).  See Exh. 2 (DOJ Press Release).  Thus, contrary to Takeda's arguments that FDCA violations do not amount to FCA liability, the aforementioned settlements (which includes the 2001 $559 million settlement of claims against TAP Pharmaceutical Products, Inc. ("TAP"), a joint venture subsidiary of Takeda) confirm that the FCA is a valid means of combating FDCA violations.[6]

There is good reason for these steep fines and settlements.  In the same fashion that a defense contractor who mixes sawdust with gun powder overcharges the government and places

---

[5]  See http://www.taf.org/top20.htm (listing the *qui tam* settlement and the criminal fines paid by the defendants).

[6]  In addition to the $559 million civil FCA settlement, TAP (a joint venture subsidiary of Takeda) also paid $25 million to various States and $290 million in criminal fines for a total of $875,000,000.  As a result of the FCA settlement, TAP also agreed to enter into a sweeping Corporate Integrity Agreement with the government.  See Actos Complaint at ¶ 32; see also Exhibit 3 (DOJ October 3, 2001 Press Release).

soldiers' lives at risk, so too does a pharmaceutical company which, despite its assurances to adequately and truthfully report drug adverse events, conceals such serious risks and falsely promotes its drugs as safer than they really are.   Such concealment and false representations result in the government paying for unsafe and more expensive drugs it otherwise would not have paid for.   As way of example, Takeda's Uloric costs as much as $5.00 a day whereas the alternative competitor costs as little as 10 cents a day.   See e.g. Exh. 4, Retail Prescription Program Drug List and Exh. 5, TrendsRx Brand Launch Alert.[7]  Yet, Takeda falsely touted Uloric as having a safer safety profile which resulted in more government beneficiary patients being placed on Uloric.   *See* Uloric Complaint at ¶4.   Similarly, Takeda falsely touted its diabetes drug, Actos, as having a safer safety profile than the competing Avandia.   While Avandia lost 65% of its market share following the disclosure of its cardiovascular risks, Takeda (as a result of its concealment of Congestive Heart Failure risks and false promotion) was able to maintain its dominant market share. See Actos Complaint at ¶ 94.   Not only did the concealment and false statements result in more sales and profits for Takeda at the cost of the government/ taxpayers, but the government actually suffered two distinct losses – *first*, paying more for a drug than it otherwise would have had to pay and *second*, being forced to hold the tab when Medicare or Medicaid patients become victims of the side effects Takeda concealed and downplayed. Under the FCA, the Government is entitled to recoup from Takeda the costs and losses it has endured as a result of Takeda's fraud and misrepresentations.  See e.g., *Cook County v. United States ex rel. Chandler*, 538 U.S.119, 129 (2003) (in passing the False Claims Act, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result

---

[7]  Likewise, the annual cost of Metformin is approximately $288 per year per patient and, on Actos, the cost is $3492 per patient per year.  See Exh 6 (Consumer Reports Best Buy Drugs).  Since the efficacy of the two drugs (Metformin and Actos) is the same (i.e., the hemoglobin A1c test used to determine blood sugar level is identical at 0.9), there is no cost efficiency with Actos and the risk benefit ratio does not justify the government paying 10 times more for Actos than Metformin.

11

in financial loss to the Government.'"); *Hess*, 317 U.S. at 544-45 ("These [FCA] provisions, considered together, indicate a purpose to reach *any person* who knowingly assisted in causing the government to pay claims which were grounded in fraud, without regard to whether that person had direct contractual relations with the government") (emphasis added).

## ARGUMENT

### I.   TAKEDA'S MOTION TO DISMISS SHOULD BE DENIED BECAUSE RELATOR'S COMPLAINTS STATE A PLAUSIBLE CLAIM UNDER THE FALSE CLAIMS ACT

A complaint survives a motion to dismiss if, taking all well-pleaded factual allegations as true, it contains "enough facts to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955 (2007).  In construing the detail required in a complaint under the Supreme Court's pleading standard, courts have held that *Twombly* and *Iqbal* do not require that the complaint include all facts necessary to carry the plaintiff's burden.  Asking for plausible grounds to infer the existence of a claim for relief "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal conduct." *Sepulveda-Villarini v. Dep't of Educ. of Puerto Rico*, 628 F.3d 25, 29-30 (1st Cir. 2010) (quoting Twombly, 550 U.S. at 556).  As explained in detail below, Relator's Complaints allege "plausible entitlement to relief." *Twombly*, 550 U.S. at 559.

Under the FCA, as amended by the Fraud Enforcement Recovery Act ("FERA") of 2009, Pub.L. No. 111–21, 123 Stat. 1617 (2009), a company incurs liability when it "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record

or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B).[8]  *U.S. ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72, n.17 (1st Cir. 2012).  The FCA and parallel state False Claims Acts of the plaintiff states thus generally impose liability upon persons who knowingly present *or cause to be presented* to the government a false claim for payment (so-called "presentment" liability) as well as persons who knowingly make, use or cause to be made or used, a false record or statement material to a false or fraudulent claim.  See 31 U.S.C. § 3729(a)(1)(A) & (B) (2009); *see also U.S. ex rel. Westmoreland v. Amgen, Inc.,* 738 F.Supp.2d 267, 272 (D.Mass. 2010).  The First Circuit has clarified that the "causes to be presented" prong of the False Claims Act results when the submissions were the reasonably foreseeable result of a defendant's actions.  *U.S. ex rel. Rost v. Pfizer, Inc.*, 507 F.3d 720, 733 n. 9 (1st Cir.2007) ("That there were allegedly intervening persons who actually submitted the claims does not itself necessarily break the causal connection when the claims are foreseeable").

Until recently, courts held that there are three theories under which a claim may be "false or fraudulent" under the FCA: (1) factual falsity; (2) legal falsity under an express certification theory; and (3) legal falsity under an implied certification theory.  In 2011, the First Circuit abolished the rigid divisions between factual and legal falsity, and express and implied

---

[8]  FERA provides that amendments to the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq., take effect upon enactment except for the amendment to the old § 3729(a)(2), which "shall take effect as if enacted on June 7, 2008, and apply to all claims under the False Claims Act ... that are pending on or after that date."  See FERA § 4(f)(1), 123 Stat. at 1625.  Relator began working at Takeda in September 2008 and filed her initial FCA Complaint on June 18, 2010 (for Actos) and March 17, 2011 (for Uloric et al.), thus, her case is governed by the FERA amendments.  To the extent the Court decides to follow the reasoning of other courts which have held that the term "claims" as used in FERA refers to claims for reimbursement as opposed to a "cause of action," then the Court could apply Section 3729(a)(2) in its pre-amendment form to all claims for reimbursement no longer pending as of June 7, 2008, and apply the amended version to those claims pending on or after June 7, 2008.  Relator, however, contends that the term "claims" as used by the statute refers to *causes of action* and that the amended version of Section 3729(a)(2) (i.e., 3729(a)(1)(B)) should apply to her entire case.  *See United States ex rel. Kirk v. Schindler Elevator Corp*., 601 F.3d 94, 113 (2d Cir.2010) (interpreting "claim" to be the cause of action).  In the end, regardless of whether the Court applies the pre or post-amendments, the outcome is unchanged.  Relator has alleged sufficient facts under both iterations of Section 3729(a)(2).

certification, noting that the text of the FCA does not make such distinctions.  Instead, the First Circuit applied a *broad view* of what may constitute a false or fraudulent statement to avoid "foreclos[ing] FCA liability in situations that Congress intended to fall within the Act's scope." *U.S. ex rel. Hutcheson v. Blackstone Medical, Inc.,* 647 F.3d 377, 387 (1st Cir. 2011) (*quoting United States v. Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1268 (D.C.Cir.2010)) (internal quotation marks omitted).

In that regard, the First Circuit endorsed the holding of a Ninth Circuit case and held "[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake; False Claims liability can attach." *Hutcheson,* 647 F.3d at 390 (*quoting U.S. ex rel. Hendow v. University of Phoenix,* 461 F.3d 1166, 1172 (9th Cir. 2006)).  Importantly, the First Circuit rejected the argument that a claim arises only when the underlying statute, regulation or contract on which a relator relies expressly stated that compliance was a precondition of payment.  *Hutcheson,* 647 F.3d at 387.  Endorsing the ruling of the D.C. Circuit, the First Circuit held that nothing within the FCA mandates that the statute or contract in question specify that compliance is a condition of payment.  *Hutcheson,* 647 F.3d at 387 (quoting *Sci. Applications Int'l Corp.,* 626 F.3d at 1268).

> **A.**     **Takeda's False Representations in Its New Drug Application/Certification And Its Knowing Concealment of Adverse Event Reports and Misrepresentations Regarding The Safety Profile of Its Implicated Drugs Resulted In False Claims Being Presented To The Government By Innocent Physicians**

In its motion to dismiss, Takeda operates under the misconception that, for the FCA to apply, the false statement must be made in relation to a condition for payment.  However, First Circuit case law, as well as case law from other circuits, has confirmed that FCA liability attaches even if the false statements were made in connection with the defendant's ability to participate in the government health care program.  Here, Relator has established that, under

federal law, prior to being allowed to promote and sell its drugs to the American public (including patients who are covered by Medicare or Medicaid), a drug manufacture must submit a New Drug Application to the FDA.  See Actos Complaint at ¶ 46.  As part of its New Drug Application for  the implicated drugs, Takeda certified to the federal government that it would "agree to update [its] application with new safety information about the product that may reasonably affect the statement of contraindications, warnings, precautions, or adverse reactions in the draft labeling"; further certified that it would "agree to submit safety update reports as provided by regulation…" and finally certified that it would " agree to comply with all applicable laws and regulations that apply to approved applications, including but not limited to…Regulations on Reports in 21 C.F.R. 314.80, 314.81…"  See Exhibit 7 (sample Form 356h); *see also* Uloric Complaint at ¶ 23 (discussing NDA requirements and Form 356h); *see also* Actos Complaint at ¶¶ 45-54 (same).

Thus, with each new drug application and supplemental application Takeda submitted to the FDA to obtain permission to market and sell the drugs at issue to patients, including Medicaid and Medicare patients, Takeda certified it would comply with all adverse event reporting requirements, including but not limited to the reporting requirements delineated in 21 C.F.R. § 314.80.  See Actos Complaint ¶¶48, 49.  Execution of the application (which includes the certification), was a condition precedent to obtaining approval to promote and market its implicated drugs.  See 21 U.S.C. § 355(a) ("*No person shall* introduce or deliver for introduction into interstate commerce any new drug, *unless* an approval of an application filed pursuant to subsection (b) or (j) of this section is effective with respect to such drug" (emphasis added)).

Takeda contends that the certification it executed in submitting its new drug and supplemental new drug applications is not an express perquisite to *payment* and, thus, argues that

the certification is inapplicable.  Takeda's Motion at 15-17.  Takeda is mistaken.  The execution

of the certification was a prerequisite to allow Takeda to promote, market and sell the implicated

drugs to U.S. consumers, including consumers receiving governmental assistance, thus, the

certification was a prerequisite to permit Takeda to *participate* in promoting and selling the

implicated drugs to U.S consumers.  Had Takeda not executed the application/certification (or

had it told the FDA that it had no intention of complying with the mandatory reporting

obligations regarding reporting of serious adverse events), its applications could not have been

approved and it could not have marketed and promoted its implicated drugs to U.S. consumers.

*See e.g.*, 21 U.S.C. § 355 (application is necessary to obtain approval); 21 U.S.C.§355(e) ("The

Secretary *shall*…withdraw approval of an application with respect to any drug under this section

if the Secretary finds…(5) the application contains any untrue statement of a material fact")

(emphasis added).  Courts have held that, when compliance with a certification is a condition for

*participation* in federal programs and it is material to the government's treatment of the claim,

then it serves as a basis for a False Claims Act violation.  *New York v. Amgen Inc.,* 652 F.3d 103,

115 (1st Cir. 2011) ("The defendants again assert that this conclusion ignores a distinction

between conditions of Medicaid payment and conditions of Medicaid participation.  *We again do

not agree that this distinction is relevant*."); *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d

1166, 1176 (9th Cir. 2006) (rejecting an argument similar to Takeda's and holding: "The

University argues that the ban is merely a condition of participation, not a condition of payment.

But in this case, *that is a distinction without a difference*.") (emphasis added); *U.S. ex rel. Main

v. Oakland City Univ*., 426 F.3d 914, 916 (7th Cir. 2005) (same); *U.S. ex rel. Bierman v.

Orthofix Intern., N.V.*, 748 F.Supp.2d 123 (D.Mass. 2010) (same).

The Seventh Circuit's *Main* decision is instructive.  In *Main,* to be eligible to participate in the federal loan and grant programs*,* a University assured the Department of Education that it would not pay recruiters contingency fees to enroll students.   *Main*, 426 F.3d at 916.   The University, however, proceeded to pay contingency fees and a *qui tam* action followed.   The University, much like Takeda, argued that, because the claims for federal loans were filed by students, its certification was not conditioned upon it receiving *payment* and thus it should be immune from liability.   *Id.*   The Seventh Circuit disagreed and held that, because the University lied in its initial certification (to obtain eligibility to participate in the loan program), any subsequent claims, even claims filed by innocent students, would be false:

> The University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make or use) a phase-two application for payment.  No more is required under the statute.  The phase-two application is itself false because it represents that the student is enrolled in an eligible institution, which isn't true.  (Likely the student does not know this, however, so the phase-two application is not fraudulent.) The statute requires a causal rather than a temporal connection between fraud and payment.  If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.

*Main*, 426 F.3d at 916; *Hendow*, 461 F.3d at 1173 (following *Main* and holding "subsequent claims are false because of an *original fraud...*").   The First Circuit as well as District Courts within this Circuit have adopted the reasoning of *Main* and *Hendow*.   *Hutcheson*, 647 F.3d at 390 (favorably quoting from *U.S. ex rel. Hendow v. University of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006)); *Amgen*, 652 F.3d at 115; *see also Bierman,* 748 F. Supp. 2d at 128. [9]

---

[9]  In addition to *Hutcheson* and *Amgen* which adopted a broad reading of the FCA and the inducement theory of FCA liability, the First Circuit also previously noted that "A number of courts have also found FCA liability violations where a defendant falsely certifies compliance with certain conditions required as a prerequisite for a government *benefit* or payment in order to induce that *benefit*.  In such cases, false certification for the purpose of receiving a payment or *benefit* becomes the practical equivalent of a statutory false claim."  *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 232, n.15 (1st Cir.2004) (emphasis added).  Accordingly, the First Circuit has recognized that certification is not solely tied to "payment" but also included "benefit" and, in this case, Takeda's false certification

In *Bierman*, the defendant generally certified that it would comply with all Medicare laws and regulations.  One of those Medicare regulations, not specifically enumerated in the certification, was that a supplier must advise beneficiaries that they may either rent or purchase durable medical equipment and the relator alleged that the defendant never gave such an option to patients.  In permitting the relator to proceed with his *qui tam* action, the Court held:

> An applicant that failed to certify that it would comply with Supplier Standard Regulation Number 5 would not be allowed to participate in the Medicare billing process.  Thus, a false certification would lead the government to make a payment it would not otherwise have made....[¶]...Accordingly, a supplier violates the FCA if it certifies compliance with applicable conditions of participation by Medicare, knowing at the time of certification that it would not abide by Supplier Standard Regulation Number 5...[¶]...The false express certification constitute both a false claim for payment under section 3729(a)(1) and a false statement made to get a false claim paid under section 3729(a)(2).

*Bierman*, 748 F. Supp. 2d at 128-29.  Here, likewise, had Takeda failed to certify that it would comply with the adverse event reporting requirements, it would not have been allowed to promote, sell and market its drug in the U.S. and the U.S. would not have paid for any of the implicated drugs since they would have been unapproved drugs.  Thus, all subsequent claims submitted for the implicated drugs, even those by innocent physicians, are inherently false.  *Id.*; *Main*, 426 F.3d at 916; *Hendow*, 461 F.3d at 1173; *U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (holding defendant liable under FCA for submitting a false certification to the government and holding that "If [defendant] had not included the no-OCI certification in its [application], [the Department of Energy] would not have approved the GPC subcontract."); *see also* S.Rep. No. 99–345, at 9 (1986), *as reprinted* in 1986 U.S.C.C.A.N. 5266, 5274 (explaining that "a false claim may take many forms" and noting that "claims may be false even though the services are provided as claimed if, for example, *the claimant is ineligible to participate in the program*.") (emphasis added).

---

bestowed upon Takeda the "benefit" of having its drugs approved for marketing and sale to U.S. consumers.

**B.      Relator's Allegations Are Not Speculative Because, Under Federal Law, a Drug Manufacturer Is Not Allowed To Sell Its Drugs Without Certifying to the FDA That It will Comply With All Adverse Event Reporting Requirements**

Next, Takeda contends that Relator's arguments are somehow speculative.  Takeda again fails to appreciate Relator's theory of liability.  Relator is not alleging that, once Takeda failed to comply with its reporting obligations, the FDA would have exercised its discretion to punish or withdraw the approval of the implicated drugs.  Rather, Relator's primary theory is that, had Takeda not submitted the application, which contained the false certification (or if it had told the FDA that it had no intention to fully comply with its mandatory reporting obligations), Takeda's new drug and supplemental new drug applications would never have been approved.  As previously stated, the applicable federal statute provides that: "*No person shall*" market a drug without FDA approval of an application.  21 U.S.C. § 355(a) (emphasis added)).  Thus, submission of the application (which includes the certification) is a condition precedent to obtaining approval to market a drug and, without it, Takeda could not have obtained approval of its drugs and its drugs would not have been reimbursable by governmental health care programs.[10]  *U.S. ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 44 (D.Mass. 2001) (prescription drugs cannot be distributed unless approved by the FDA and Medicaid does not pay for unapproved drugs);

---

[10]  Moreover, even if the FDA's post approval conduct were at issue, there would be nothing to speculate over since the statute provides that the Secretary "*shall*" withdraw the approval once it learns that the application contained a material misrepresentation.   See 21 U.S.C.§355(e) ("The Secretary *shall…* withdraw approval of an application with respect to any drug under this section if the Secretary finds…(5) the application contains any untrue statement of a material fact." ) (emphasis added).  The Supreme Court has held that the use of the word "*shall*" in statutory language means that the relevant person or entity is under a *mandatory* duty.  *U.S. v. Monsanto*, 491 U.S. 600, 607 (1989) (By using "shall" in a civil forfeiture statute, "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied...."); *Pierce v. Underwood*, 487 U.S. 552, 569-70 (1988) (Congress's use of "shall" in a statute was "mandatory language").  Thus, once it is determined that Takeda has made a material misrepresentation in its application, and the Supreme Court has held that failing to report adverse events is *material*, *see Matrixx*, 131 S.Ct. at 1323, then the Secretary is under a mandatory obligation to withdraw the application (and there would be nothing to speculate over as the Secretary does not have discretion).

*Amgen*, 652 F.3d at 115 (1st Cir. 2011) (false representations made in Medicaid participation applications caused subsequent claims to be false); *Hendow*, 461 F.3d at 1173 ("subsequent claims are false because of an original fraud…"); *Main*, 426 F.3d at 916 (same); *Harrison*, 352 F.3d at 916-17 (same); *Bierman*, 748 F. Supp. 2d at 128 (same).

*Alternatively*, if Takeda had complied with its mandatory reporting obligations and accurately reported the life threatening and serious adverse events associated with its products, and provided prompt warnings regarding these adverse events as it was obligated to do, *see Wyeth v. Levine*, 555 U.S. 555, 570 (2009), then its warnings would have resulted in diminished sales/prescriptions and resulted in fewer reimbursable claims.[11]   However, in lieu of issuing warnings and truthfully reporting adverse events, Takeda did the opposite and actually overtly and fraudulently promoted the safety and efficacy of its implicated drugs to physicians.  It is this overt fraudulent misrepresentation to the medical community (in addition to the failure to comply with its adverse event reporting obligations) that further triggers Takeda's FCA liability. *Franklin*, 147 F.Supp.2d at 52 (pharmaceutical company's false promotional statements to physicians which caused physicians to prescribe the company's drugs are actionable under the FCA).

---

[11]   There is nothing hypothetical about Relator's contention that enhanced warnings would have resulted in less sales.  As way of example, when Congestive Heart Failure risks were publicized regarding Avandia (a drug that competes with and is in the same class as Actos), the sales of Avandia declined by 65% (see Actos Complaint at ¶94).  In contrast, sales of Actos remained unchanged because Takeda concealed its true CHF risks and overtly misrepresented to the medical community that its drug had a safer CHF profile.  See Actos Complaint at ¶¶55-95.  Following the U.S. bladder cancer warnings (see Exh. 8) and Actos being taken off the market in Germany and France (see Exh. 9, Hillaire-Buys et al., "Pioglitizone and bladder cancer," The Lancet, October 29, 2011), Takeda's sales began to drop and, by March 31, 2012, the company posted a 24 percent drop in sales, accounting for 20 percent of Takeda's total revenue.  Exh. 10, Matsuyama, "Takeda Falls Most in 14 Months on Forecast: Tokyo Mover," Bloomberg, May 13, 2012.

**C.**     **Contrary to Takeda's Arguments, Courts Within This Circuit Have Recognized that A Drug Manufacturer's Violations of the FDCA Can Result In Drug Manufacturer's Liability Under the FCA**

Takeda next advances arguments other courts within this district have already rejected. Takeda contends that Relator is utilizing the FCA as an end-run around the enforcement provisions of the FDCA. See Motion at 21-23. In rejecting a nearly identical argument, the *Franklin* Court held "the FCA *can* be used to create liability where failure to abide by a rule or regulation amounts to a material misrepresentations made to obtain a government benefit." *Franklin*, 147 F.Supp.2d at 51 (emphasis in original). The *Franklin* Court went on to note that, just because Congress has not provided for a specific cause of action for monetary damages against pharmaceutical companies who violate FDCA rules and falsely promote the safety and efficacy of their products (resulting in increased prescriptions), does not mean that the pharmaceutical company is not liable under the FCA for it violations and fraudulent misrepresentations to the medical community. *Franklin*, 147 F.Supp.2d at 52.

**D.**     **Takeda's Violations of Its Adverse Event Reporting Obligations and Its Overt Misrepresentations Regarding The Safety of The Implicated Drugs Are Presumptively Material To the Government, Regulators and the Medical Community**

Takeda concludes its 12(b)(6) arguments by preposterously claiming that its violations of the adverse event reporting requirements are "not material" to federal regulators and the medical community. Determination of whether a claim is materially false or fraudulent "is a fact-intensive and context-specific inquiry." *Amgen*, 652 F.3d at 111. A false statement is material if it has "a natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed." *U.S. ex rel. Jones v. Brigham & Women's Hosp.*, 678 F.3d 72 (1st Cir. 2012) (quoting *Neder v. United States*, 527 U.S. 1, 16 (1999)) (internal quotation marks omitted). *Jones* is instructive and indeed dispositive of Takeda's arguments. In

*Jones*, the First Circuit held that a grant applicant's manipulation of scientific data was material and constituted a violation of the FCA. *Jones*, 678 F.3d at 93-94. In determining materiality, the First Circuit relied upon the testimony of Relator's experts (which were former grant reviewers) who testified that the manipulated data would be material to grant reviewers. *Jones*, 678 F.3d at 94. The First Circuit thus reversed the trial court's *summary judgment* ruling and held that a genuine issue of material fact existed as to whether manipulated data "would be capable of influencing the reviewers' decision." *Id.* As in *Jones*, following discovery and at the correct procedural posture, Relator in this case can likewise marshal in experts, including former FDA employees, to testify that adverse event reporting requirements are material to the FDA's determination in approving and maintaining the approval of prescription drugs.[12] Thus, Takeda's materiality objections are not only meritless but also premature.

Moreover, at this procedural posture, it goes without saying that the adverse event certification at issue here (i.e., Exhibit 7 -- Form 356h) is material to the FDA approving Takeda's drugs and permitting Takeda to market, promote and sell the implicated drugs to U.S. consumers. Takeda's certification assures the FDA that it will be kept abreast of new risks so that it can take appropriate regulatory actions, and that the medical community will learn of the true risks and benefits associated with the implicated drugs. Adverse event reports (and adequate labels) are material to physicians so as to allow them to make proper risk/benefit assessments

---

[12]  In Fact, the FDA has acknowledged that the adverse event reporting system ("AERS") is integral to its ability to evaluate potential safety concerns and to "improve product safety and protect the public health, such as updating a product's labeling information, restricting the use of the drug, communicating new safety information to the public…" *See* Exhibit 11, FDA AERS Description; *see also* Exhibit 12, FDA's Guidance for Industry – Good Pharmacovigilance Practices (noting the importance of adverse event reports and further holding that "[i]t is possible that even a single well-documented case report can be viewed as a signal [of a potential safety risk]…"

prior to prescribing a drug;[13] they are material to Governmental Health Care underwriters who determine which drugs to list on approved formularies; and equally relevant to the FDA which regulates the approval and continued approval of drugs in the United States.  The FDA has issued enhanced warnings and even pulled drugs from the market based solely on adverse event reports.  See e.g., DAVID J. GRAHAM ET AL., *Spontaneous Reporting – USA, in* PHARMACO-VIGILANCE at 225 (John Wiley & Sons, Ltd., 2002) (noting there have been 16 major prescription drugs pulled from the market based, in part, upon analysis of post-marketing adverse event reports) (Exhibit 13).  Most importantly, even the Supreme Court recently held that adverse event reporting obligations are *material* to the FDA, the medical community and the public. *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1319-1323 (2011).

## II.    RELATOR HAS ALLEGED HER CLAIMS WITH SUFFICIENT PARTICU-LARITY AND IN COMPLAINCE WITH THE REQUIREMENTS OF RULE 9(B)

Takeda next argues that Relator's Complaints fail to comply with the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  *See* Takeda's Motion at 26-32.  Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's

---

[13] Indeed, there is a *presumption* that the failure to report adverse events is material to the physicians' decision to prescribe the implicated drugs.  The First Circuit has held that, when a drug manufacturer has failed to provide an adequate warning, a presumption arises "that a physician would have heeded an adequate warning." *Garside v. Osco Drug, Inc.,* 976 F.2d 77, 80-81 (1st Cir. 1992); *see also Knowlton v. Dessert Medical, Inc.*, 930 F.2d 116, 123 (1991) ("The presumption is accepted in most jurisdictions, including Massachusetts, that if a warning is given, it will be followed.  It is difficult to accept that a proper warning would have been deliberately ignored.") More importantly, the Supreme Court has recently held that adverse event reports are material to the FDA and the medical community's understanding of drug risks and that a failure to report adverse event reports is also material to the public. *Matrixx*, 131 S.Ct. at 1323 (case involved a drug company that failed to report a small handful of adverse events – some included as little as 10 reports).  If failure to report a small number of adverse events is material to investors who are deciding whether to risk their money in the drug company, *see Matrixx*, 131 S.Ct. at 1323, it follows that a company's failure to report *hundreds* of serious adverse events is also be material to physicians who are deciding whether to risk their patients' lives and safety on the company's drug.

mind may be alleged generally." FED.R.CIV.P 9(b).  The purpose of the specificity requirement is to ensure that the complaint provides a defendant with fair notice of a plaintiff's claim and with adequate information to frame a response.  *Warshaw v. Xoma Corp.*, 74 F.3d 955, 960 (9th Cir. 1996); *U.S. ex rel. Franklin v. Parke-Davis*, 147 F.Supp.2d 39, 46 (D.Mass. 2001).

### A.    Relator Has Alleged Her Claims Regarding the Concealment of Adverse Events With Sufficient Particularity To Allow Takeda To Prepare A Meaningful Response

Appellate courts, including the First Circuit, have increasingly applied a relaxed 9(b) standard to lawsuits under the False Claims Act.  *Duxbury*, 579 F.3d at 29 (relator could satisfy Rule 9(b) by providing "factual or statistical evidence to strengthen the inference of fraud beyond possibility" without necessarily providing details as to each false claim); *U.S. ex rel. Lusby v. Rolls-Royce Corp.,* 570 F.3d 849, 854 (7th Cir. 2009) ("We don't think it essential for a relator to produce the invoices (and accompanying representations) at the outset of the suit....To say that fraud has been pleaded with particularity is not to say that it has been proved (nor is proof part of the pleading requirement); *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. April 8, 2009) ("[A] relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.")  Similarly, district courts, including courts in this circuit, have routinely relaxed the pleading requirements of Rule 9(b) in cases involving complex or extensive schemes of fraud (such as the present case).  *See e.g., Franklin,* 147 F.Supp.2d at 47; *U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 238 F.Supp.2d 258, 269 (D.D.C.2002); and *U.S. ex rel. Johnson v. Shell Oil Co.*, 183 F.R.D. 204, 206-07 (E.D.Tex.1998) (collecting cases).  In *Johnson*, the Court lucidly observed:

It is only common sense that the sufficiency of pleadings under Rule 9(b) may depend 'upon the nature of the case, the complexity or simplicity of the transaction or occurrence, the relationship of the parties and the determination of how much circumstantial detail is necessary to give notice to the adverse party and enable him to prepare a responsive pleading.'… Similarly, it has been widely held that where the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied….To approach the issue otherwise would allow the more sophisticated to escape liability under a False Claims case due to the complexity of their scheme and their deviousness in escaping detection.

*Johnson*, 183 F.R.D. at 206-07*; accord, Franklin*, 147 F.Supp.2d at 49 ("where the alleged scheme of fraud is complex and far-reaching, pleading every instance of fraud would be extremely ungainly, if not impossible.")  As seen in these and other cases, relators have been permitted to allege the details of fraudulent schemes generally and support them with one or more representative examples, as Relator has done here.  They have also permitted relators to allege facts and circumstances showing that claims have been presented, as Relator has done here, rather than require detailed allegations of the claim itself.

Courts have generally held that, in cases involving fraud, plaintiffs must plead "the who, what, where, and when," however, as outlined *supra*, courts in *qui tam* cases have routinely relaxed a relator's requirements in that regard.  *Duxbury*, 579 F.3d at 29-30; *Lusby,* 570 F.3d at 854.  In terms of the *who*, *what where* and *when*, Relator has, in excruciating detail, alleged that her superiors and managers, including but not limited to *Maria Paris,* M.D., Vice President of Takeda's Pharmacovigilance Department; *Gregory Fusco*, Director of Pharmacoepidemiology; *Niela Smith*, Senior Medical Director; *Michelle Peralta*, a project manager; *Mike Zabinas*, a nurse specialist; *Betsy Fletcher*, the Uloric Post-Marketing Manager; and *Michelle Hisada*, a Medical Director (the *who*) instructed Relator that, in order to secure her continued employment, she must conceal or alter the serious adverse reports Takeda was receiving from physicians (the *what*), that these events transpired throughout the time period (2008-2010) that Relator was

25

employed at Takeda as well as prior to her employment (the *when*) and these events occurred at Takeda's U.S. headquarters in Lake Forest, Illinois (the *where*).  Relator's Complaints outline in excruciating detail multiple instances in which these superiors forced her (and others at Takeda) to alter and conceal serious adverse event reports associated with the implicated drugs.  See Actos Complaint at ¶¶ 72-84; Uloric Complaint at ¶¶ 50-66.

While Takeda does not dispute the specificity of Relator's complaint vis-à-vis the concealment of adverse event allegations, Takeda, nonetheless contends her claims should be dismissed because she has not identified the innocent physicians who were unwittingly induced to prescribe Takeda's drugs and who submitted reimbursement claims to the government.  Takeda misconstrues Relator's burden at the pleading stage for such inducement actions.  Relator is not obligated during the pleading stages to marshal in each of the Uloric, Actos or Dexilant claims submitted by third-party physicians because she does not have access to this information and, even if she did, its submission would cause the complaint to exceed hundreds of thousands of pages.  *Franklin*, 147 F.Supp.2d at 49 (holding that Relator did not need to identify the false claims submitted by physicians because he did not have pre-discovery access to such information and that "pleading every instance of fraud would be extremely ungainly, if not impossible.")  As another district court stated:

> This Court concludes that, given the purposes of Rule 9(b), the specifics of all claims are unnecessary at the pleading stage.  The gravamen of this action concerns fraudulent inducement of doctors, and the Complaint provides exhaustive allegations relating to this fraud.  In this context, the specifics of the claims themselves are somewhat less important.  Instead, the case concerns the marketing activities of Defendants and whether they acted in reckless disregard of the truth.  The allegations in the Complaint put defendants on sufficient notice of the nature of the action, and given the immense number of claims at issue, requiring them to be listed one-by-one in the Complaint is ungainly and unfair.  While Plaintiff undoubtedly bears the burden of proof as to damages, Plaintiff need not conclusively meet this burden at the pleading stage.

*U.S. ex rel. Strom v. Scios, Inc.*, 676 F.Supp.2d 884, 893-94 (N.D.Cal. 2009); *see also Lusby,* 570 F.3d at 854 ("We don't think it essential for a relator to produce the invoices…at the outset of the suit...."). To be sure, the government has paid billions of dollars for the Takeda drugs at issue in this litigation. As way of example, according to statistics released by the Centers for Medicare and Medicaid Services ("CMS"), in 2008, the federal government paid $1,062,975,107 for Actos; and in 2009, the government's tab for Actos was $1,188,291,746. See Exhibit 1.[14] Takeda apparently expects Relator to submit the claims for each of the hundreds of thousands (and indeed millions) of Actos claims that the government unnecessarily paid. Such herculean and impossible feats are not mandated under established First Circuit precedent. Specifically, the First Circuit has held that a *qui tam* complaint need not "provid[e] the details as to each false claim" and that it only needs reliable indicia inferring that claims were actually submitted.[15] *Duxbury*, 579 F.3d at 29; *see also Bierman*, 748 F.Supp.2d at 129-30; *Westmoreland II,* 738 F.Supp.2d at 277 (complaint survived Rule 9(b) where it contained a sampling of the false claims without identifying each particular claim); *U.S. ex rel. Rost v. Pfizer*, Inc., 253 F.R.D. 11, 16-17 (D.Mass. 2008) (holding that relator's claim survived Rule 9(b) even though he had not

---

[14] Also, according to CMS, in 2008, a total of 846,081 Medicare beneficiaries were prescribed Actos and, in 2009, a total of 839,030 Medicare beneficiaries were prescribed Actos. See Exhibit 1. This exhibit was downloaded and printed from the CMS website. The specific information and specific dollar amounts from Exhibit 1 are not reflected in the Actos Complaint, however, Relator requests that the Court take judicial notice of this information pursuant Federal Rules of Evidence, Rule 201. If the Court feels the information obtained from CMS should be included in the complaint, Relator respectfully requests that the Court grant her leave under Federal Rules of Civil Procedure, Rule 15(a), to amend her complaint to include this information.

[15] As alleged in the Actos Complaint, through Takeda's concealment of serious adverse events and its fraudulent misrepresentations to the medical community and the government regarding the safety of Actos, Actos became Takeda's most profitable drug with $3.1 billion annual sales in 2008 and $3.4 billion annual sales in 2009. See Actos Complaint at ¶13. It does not require a leap of faith to infer that at least a percentage of these billions of dollars in annual sales are attributable to prescriptions paid by the Federal and State governments. As outlined by the stats released by the federal government (Exhibit 1), at least 33% of all Actos sales were paid by the government (approximately $1 billion in 2008 and $1 billion in 2009).

identified the individual physicians who had received kickbacks since such information was not within relator's possession); *and Rost*, 507 F.3d at 732 ("Rule 9(b) may be satisfied where, although some questions remain unanswered, the complaint as a whole is sufficiently particular to pass muster under the FCA").

### B. The *Tessitore* Decision is Factually Distinguishable Because, Unlike Dr. Ge, the Relator In Tessitore Was Not A Pharmaceutical Company Insider and Did Not Have the Detailed Allegations As Does Dr. Ge

Takeda places great stock in *U.S. ex rel. Tessitore v. Infomedics, Inc.*, __F.Supp.__2012 WL 826889 (D.Mass., March 12, 2012), and contends that, because *Tessitore* was dismissed, so should Relator's case.[16]   While Relator respectfully disagrees with the ultimate conclusion reached by the *Tessitore* court, the facts of *Tessitore* are distinguishable.  In *Tessitore*, the relator did not work for the pharmaceutical company, but rather worked for a third-party company that transcribed consumer calls.  The relator in *Tessitore* alleged that the pharmaceutical company, GSK, told her employer, InfoMedics, to not forward any adverse event calls and thus she contended that a number of consumer adverse events were never reported to the FDA.  The *Tessitore* relator did not have any evidence of how many adverse events were unreported, but relying upon estimates published by a consumer group, estimated that 7% of all calls were adverse events.  *Tessitore,* 2012 WL 826889 at *2.  Like Takeda, the pharmaceutical defendant, GSK, filed a motion to dismiss based on Rule 12(b)(6) and Rule 9(b) claiming that (a) failure to report adverse events do not amount to an FCA violation (Rule 12(b)(6)); and (b) that relator's complaint did not contain the particularity as required by Rule 9(b).  *Tessitore,* 2012 WL 826889

---

[16]   In multiple instances within its brief, Takeda takes the time to highlight that some of Dr. Ge's attorneys were the same attorneys who represented the relator in *Tessitore*.  *See* Takeda's Motion at 1 & 19.  It is not clear what relevance, if any, these ad hominem attacks on relator's counsel have to this case, but it is ironic that Takeda omits the fact that one of Dr. Ge's attorneys was the same attorney who prosecuted TAP (a joint venture subsidiary of Takeda) in 2001 for its FDCA violations which resulted in TAP paying a $559 million FCA settlement and a $290 million criminal fine.

at *3.  What Takeda fails to inform the Court is that, in *Tessitore*, the Government submitted a

"Statement of Interest" wherein it *contested* the legal position adopted by the defendant but

argued that the relator failed to support her allegations that any reporting violations occurred.

*See Tessitore*, 2012 WL 826889 at *3.  Importantly, in its Statement of Interest, the Government

agreed with the relator that an adverse event reporting violation can form the basis of an FCA

action.  Specifically, in its Statement of Interest, the Government stated:

> In other contexts, facts that give rise to violations of the FDCA and its regulations could
> also give rise to an FCA violation; similarly, violations of the adverse event reporting
> requirements could in some circumstances defraud the FDA in such a way that would be
> material to the government's decision whether to pay for the products.

See Exh. 14, Governments Statement of Interest Filed in *Tessitore*.  Thus, in its Statement of

Interest, the Government specifically endorsed the very theory Dr. Ge has advanced in this case.

The Government's conduct in other litigation (including litigation involving the same class of

diabetes drugs at issue in this case (i.e. Thiazolidinediones or "TZDs"), confirms that failure to

report adverse events can result in FCA violations, including civil and criminal fines.

Specifically, just recently the United States entered into a $3 billion settlement with GSK, arising

from, among other things, GSK's failure to report serious adverse events associated with its drug

Avandia (a diabetes medication in the same class as Actos).   See Exh. 15, Government's

Indictment Against GSK at ¶¶82-95; *see also* Exh. 2, Government's Press Release Regarding

GSK Settlement.  Thus, contrary to Takeda's arguments, the failure to report serious adverse

events can form the backbone of an FCA violation.  *See id.*; *see also U.S. ex rel. Allen v. Guidant

Corp.*, 2012 WL 878023 (D. Minn. Mar. 14, 2012) (finding that relator's FCA complaint which

simply alleged that device manufacturer was aware of risks associated with its device and failed

to disclose these risks to the FDA was sufficient to withstand any Rule 9(b) challenges).

Notably, as a result of the Government's Statement of Interest, the Court in *Tessitore* did not

dismiss Relator's claims on 12(b)(6) grounds, rather the Court held that relator failed to plead fraud with particularity.

As to the particularity issue, however, *Tessitore* is distinguishable. Notably, the relator in *Tessitore* did not work for the pharmaceutical company (GSK) and thus was not able to produce any evidence of *who* at GSK was involved in the concealment enterprise; no information about internal GSK procedures regarding reporting; no information regarding the contents of any of GSK's communications with the FDA; and no information regarding GSK's scienter. *See Tessitore*, 2012 WL 826889 at *8. Unlike the relator in *Tessitore*, however, Dr. Ge is a company insider who worked in the pharmacovigilance department at Takeda's headquarters. Her Complaints are replete with detailed information regarding key employees and top managers who were involved in the scheme to conceal and miscode serious adverse event reports, see Actos Complaint at ¶¶ 72-84 and Uloric Complaint at ¶¶ 50-66. Her Complaints further outline detailed and specific adverse event reports submitted to the FDA which were miscoded or altered so as to avoid drawing attention to the seriousness of the events, see Actos Complaint at ¶¶ 72-84 and Uloric Complaint at ¶¶ 50-66, she delineates specific instances wherein senior Takeda officials instructed her to alter adverse event reports, see Actos Complaint at ¶¶ 72 -84 and Uloric Complaint at ¶¶ 50-66, and she demonstrates that Takeda had the requisite scienter as substantiated by Takeda's VP of Pharmacovigilance, Dr. Paris, whose motto was "As a company reporting adverse events in one thing, but we must make sure that the company has to be profitable first." *See* Actos Complaint at ¶¶15, 80. Thus, unlike the *Tessitore* relator (who was not a pharmaceutical company insider), Dr. Ge's complaint alleges the very information that the court held was lacking in *Tessitore*.

While Relator contends she has alleged sufficient facts to distinguish herself for the non-insider relator in *Tessitore*, Relator does disagree with the *Tessitore* court on one primary issue. The *Tessitore* court apparently found it compelling that the Government had stated that it was aware of the adverse events at issue in that case and took no action.  Without addressing the merits of the Government's statements, it is worth emphasizing that, in this case, there is *no evidence* the Government was previously aware of the adverse event manipulation and the concealment of adverse event reports Relator has alleged here.  Moreover, Takeda (relying upon *Tessitore*) dedicates much ink arguing that Relator's claim is speculative in that, despite Relator's allegations, the implicated Takeda drugs have not been withdrawn and have not suffered any negative administrative actions.[17]  Thus, Takeda implies its failure to report adverse events were not material to the Government's decisions.  *See* Takeda Motion at 17-23 and 30-32. Takeda misconstrues the appropriate standard that governs FCA claims.  As a court within this

---

[17]  However, the FDA did require Takeda to change its label to warn of Actos' bladder cancer risk in September 2010 and June 2011.  Other countries such as Germany and France withdrew Actos from the market in June 2011 altogether due to the drug's bladder cancer risks.  These are risks Dr. Ge observed during her tenure at Takeda between 2008 and 2010, which she attempted to report, was instructed not to, and was even told to alter her reports.  She was subsequently fired.  Moreover, as Dr. Ge alleges in her complaint, Takeda knew about the bladder cancer risk from its early animal studies and its early human clinical trials, which included cytology testing to screen out those at risk for bladder cancer, however the label did not instruct physicians to conduct cytology testing prior to prescribing the drug.  If that weren't enough, in 2005, Takeda minimized the actual total number of Actos bladder cancer events in a report on a study called PROactive, added in a fake placebo event and disguised a statistically significant four times greater rate of bladder cancer.  See Exh. 16, Hillaire et al., "Pioglitizone and the risk of bladder cancer," British Medical Journal, May 31, 2012;  *See also* Complaint ¶¶ 98-104.  Thus, pursuant to C.F.R. 21, Section 201.57 and the Supreme Court's ruling in *Levine*, Takeda had a duty to warn of the risk at the time Actos was first released onto the market and certainly should have updated its warning later when bladder cancer adverse events began to accumulate.  Since the FDA's bladder cancer warning mandate and Germany and France's withdrawal of Actos from the market, sales of Actos have declined.  Simply put, the Actos label failed to warn of Actos' bladder cancer risk, which resulted in it being misbranded, just as Avandia has been deemed misbranded in violation of 21 U.S.C. Sections  331(e), 333(a)(1) and 335(k)(1) in the recent GSK FCA settlement.  See Exh. 15, Government Indictment, ¶¶ 82-95.  See also Exh. 17, DOJ's "GlaxoSmithKline Settlement Fact Sheet" (GSK agreed to plead guilty to three misdemeanor violations of the FDCA, including: "Regarding Avandia, GSK will plead guilty to failure to report data to the FDA, in violation of 21 U.S.C. §§ 331(e), 333(a)(1) & 355(k)(1).")  Likewise, Uloric, Prevacid and Kapitex/Dexilant were misbranded due to Takeda's failure to include warnings concerning their adverse drug interactions.  *See* Complaint, ¶¶ 107-128.

district has held, the focus is not on the Government's conduct, rather the focus is what the

Government was authorized to do under law (irrespective of whether it ultimately exercised its

rights):

> Evidence of the government's actual *conduct* is less useful for FCA purposes than evidence of the government's legal *rights*. I decline to adopt rules of law that would enable the government to determine materiality by its reaction to either a violation of the RGEs, or a failure to submit properly signed financial forms. Materiality must turn on how USAID was authorized to respond to such failures, or else violation of identical provisions in separate cases could have different materiality results based on the predilections of particular program or accounting staff.

*United States v. President & Fellows of Harvard Coll*., 323 F. Supp. 2d 151, 186 (D. Mass.

2004) (emphasis in original).  In *President & Fellows*, the defendants tried to argue that their

fraud and concealment of conflicts of interests were not material to the government's decision,

based upon the government's actions, *see id*. at 184-186, yet the district court held that the

outcome of the case cannot rest on what the Government did (or did not do), but rather the case

must be judged based on what the government's rights were under the law.  *President & Fellows*

*of Harvard Coll*., 323 F. Supp. 2d at 186; *see also U.S. ex rel. Harrison v. Westinghouse*

*Savannah River Co.*, 352 F.3d 908, 916-17 (4th Cir. 2003) (rejecting argument that, because

government continued to fund contractor after discovering false claims, their falsity cannot have

been material); *United States v. Rule Indus., Inc.,* 878 F.2d 535, 537 (1st Cir. 1989) (finding

defendant liable under FCA for violating Buy America Act certification even though government

kept and was satisfied with product supplied).   Here, under the applicable statutes and

regulations, the FDA had the right to either not approve or withdraw the approval of a drug

application that failed to comply with the drug approval requirements, which *inter alia*, included

the requirement that the drug company agree to comply with all adverse event reporting

obligations.   See 21 U.S.C. § 355(a).   Moreover, the statute goes on to provide that: "The

Secretary *shall*…withdraw approval of an application with respect to any drug under this section if the Secretary finds…(5) the application contains any untrue statement of a material fact." (emphasis added).  Thus, not only did the FDA have the right to withdraw the drug application of an applicant that refuses to comply with adverse event reporting obligations, but indeed the FDA is not even allowed to approve the application of such an applicant.[18]  Thus, contrary to Takeda's arguments, the focus is not on what the government has done since being appraised of Relator's allegations, rather, the focus is on what the Government is authorized to do.  The statutes cited above (as well as the Government's actions vis-à-vis Avandia) confirm that the Government had the right to never approve the drug applications (if it had known that Takeda would not comply with the adverse event reporting obligations), it had the right to mandate more severe warnings (which it ultimately did for bladder cancer associated with Actos), and it had the right to place restrictions on the use of the drugs (as it did with GSK's Avandia when reports regarding the cardiovascular risks surfaced).  Thus, the Government had numerous rights within its arsenal to restrict and limit the sale of the implicated drugs which would have resulted in fewer Actos (or Uloric and Dexilant) claims being submitted to the government, as was the case with Avandia which lost 65% of its sales once the reports regarding the serious adverse events became publicized.[19]

---

[18]  See footnote 10, *supra*, citing cases which have held that when, Congress uses the word "shall" (as it did in 21 USC 355(e)), it denotes a *mandatory* (i.e., non-discretionary) duty to act.

[19]  Takeda's reliance upon *United States ex rel. Roop v. Hypoguard*, 559 F.2d 818 (8th Cir. 2009), is also misplaced.  In *Hypoguard*, the Eighth Circuit found that the relator had not sufficiently alleged a basis to conclude that the failure of reporting would have impacted agency action, not that such allegations could not state a claim even if sufficiently pleaded.  *Id*. at 825.  The Court in *Hypoguard* merely decided that the relator's "conclusory allegation" in that case (i.e., that the government would have recalled the products and not reimbursed such claims if it had known of the defects) was not sufficient to comply with Rule 9(b).  *Id*. *See also Hess*, 317 U.S. at 543-45 (recognizing that FCA liability can be based on claims that are the product of a fraudulent course of action – "The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal - payment of government money to persons who had caused it to be defrauded.")  Like *Hess*, and other inducement liability theories in the other pharmaceutical FCA cases

## III.   RELATOR'S STATE LAW FALSE CLAIMS ACT CLAIMS ARE NOT PREEMPTED BY FEDERAL LAW

Takeda's final salvo is its contention that Relator's state law claims are preempted by federal law.  Takeda argues wrongly that the holding in *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341 (2001) requires this Court to dismiss all claims brought under State false claims act laws. See Takeda's Motion at 32-34. No court has dismissed a false claims case on this basis, and for good reason. As cogently observed by courts within this district:

> The 'strong medicine' of federal preemption is not casually to be dispensed ... especially ... when the federal statute creates a program, such as Medicaid, that utilizes 'cooperative federalism ': Where coordinated state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal preemption becomes a less persuasive one.

*In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d 187, 198 (D. Mass. 2004), aff'd, 582 F.3d 156, 172 (1st Cir. 2009).  As this Circuit has recently recognized, *Buckman* and federal preemption law do not preclude claims for damages even where a defendant's conduct also violates federal health care regulations.  *In re Pharma. Indust. Avg. Wholesale Price Litig.,* 582 F.3d 156, 172 (1st Cir. 2009) (hereafter *"AWP Litig.").*  Takeda's argument categorically precludes any *qui tam* actions and any State from recovering for damages where the wrongdoer also offends the terms of the FDCA, or other federal laws.

The putative class of injured plaintiffs in *Buckman* filed common-law tort claims under State law alleging that the defendant company that assisted the manufacturer in "navigating" the regulatory process caused their injury by making "fraudulent representations" to clear the device.

---

litigated in this district and circuit, Takeda, whose original fraudulent concealment and fraudulent representations regarding the safety of the implicated drugs, caused prescription claims to be submitted to governmental health entities that otherwise would not have been submitted and is thus liable for the resulting damages to the government.  *Franklin*, 147 F.Supp.2d at 52-53 (holding that "an intervening source only breaks the causal connection when it is unforeseeable" and that "the participation of the doctors and pharmacists in the submission of false Medicaid claims was not only foreseeable, but was an intended consequence of the [drug manufacturer's] alleged scheme of fraud.")

531 U.S. at 343.  *Buckman* found federal preemption because the injured plaintiffs' "fraud claims exist solely by virtue of the FDCA disclosure requirements."  *Id.* at 353.   Different in kind, Relator here claims that Takeda made false statements material to false claims, and knowingly presented and caused to be presented for payment from government health plans reimbursement of expense for drugs which were not as safe as Takeda had led regulators, the medical community and the public to believe.  The FCA and State false claims statutes provide causes of action for this conduct, irrespective of how Takeda managed to place those adulterated and misbranded devices into the marketplace.  That Takeda did so, *in part,* by lying to the FDA in its new drug applications does not call into question the viability of an FCA action to recover for the payment of false claims.  It is of no moment that Takeda also violated federal regulations as it violated the FCA.

This Circuit, in the *AWP Litig.,* rejected a nearly identical argument that plaintiffs' state consumer protection claims were preempted by federal law under *Buckman.*  As the Court began, "our preemption analysis invariably returns to ... two cornerstones: Congress's purpose, and where it legislates in a field which the States have traditionally occupied, Congress's clear and manifest intent to preempt state law."  *AWP Litig.,* 582 F.3d at 172. Takeda offers nothing to suggest Congressional express or implied intent to preclude causes of action under the FCA or State false claims laws.  As in the *AWP Litig.,* the "opposite proposition is true: that Congress relied on the existence of state consumer protection and fraud statutes to combat ... schemes resulting in overpayments by Medicare," *id.* at 175, as amendments strengthening the FCA's *qui tam* provisions also affirm.

There is also no conflict between the federal government's ability to enforce the FDCA and the ability of States (or relators in *qui tam* actions) to recover damages for payment of false

claims, they address different breaches of law with different remedies.  While "true ... that the chain of events by which ... plaintiffs suffered damages ran through the Medicare program," like the FDCA here, "that fact alone does not establish that the ... program is itself the basis of the lawsuit...." *AWP Litig.,* 582 F.3d at 176.  Relator is not claiming the FDCA implies a private right of action.  Instead, the question is of no relevance where the FCA and State false claims acts provide their own grounds for suit, grounds which do not conflict with the aims of the FDCA.  Moreover as the district court in *AWP Litig.* recognized, "Medicaid is the paradigmatic program of cooperative federalism…[and]  matters of public health and medical fee regulation have been a field traditionally occupied by the states, and states have historically played a significant role in investigating and prosecuting Medicaid fraud," *see In re Pharm. Indus. Average Wholesale Price Litig.*, 321 F. Supp. 2d at 198, thus Relator's claims brought under State false claims act laws are not in conflict with nor preempted by federal law.

## REQUEST FOR LEAVE TO AMEND

If the Court were to determine that Relator's Complaints are deficient in any regard, Relator respectfully requests that this Court afford her an opportunity to amend her complaint. Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires," and reflects a liberal amendment policy.  *O'Connell v. Hyatt Hotels of P.R.*, 357 F.3d 152, 154 (1st Cir.2004); *Rost*, 507 F.3d at 733-34 (same); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (leave to amend should be "freely given").

## REQUEST FOR ORAL ARGUMENT

Relator hereby respectfully requests oral argument on this motion.

## CONCLUSION

For all of the foregoing reasons, Relator respectfully requests that the Court DENY Takeda's motion to dismiss.

Dated: July 17, 2012                                        Respectfully submitted,


                                        By:    /s/ Bijan Esfandiari
                                               Bijan Esfandiari (*pro hac vice*)
                                               BAUM HEDLUND ARISTEI & GOLDMAN
                                               12100 Wilshire Blvd., Suite 950
                                               Los Angeles, CA 90025
                                               Telephone: (310) 207-3233
                                               Fax: (310) 207-4204
                                               besfandiari@baumhedlundlaw.com

                                               Michael Sullivan, Esq., BBO# 487210
                                               The Ashcroft Group, LLC
                                               1 Post Office Square, Suite 3750
                                               Boston, MA 02109
                                               Telephone: (617) 617-573-9400
                                               Facsimile: (617) 617-573-9400
                                               msullivan@ashcroftlawfirm.com

                                               *Attorneys for Relator, Helen Ge, MD*


## CERTIFICATE OF SERVICE

I, Bijan Esfandiari, hereby certify that a true copy of the foregoing document filed through the ECF system will be electronically sent to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on July 17, 2012.


                                        /s/Bijan Esfandiari
                                        Bijan Esfandiari